814 So.2d 347 (2002)
Jan MALICKI, St. David Catholic Church, and the Archdiocese of Miami, Petitioners,
v.
Jane DOE, et al., Respondents.
No. SC01-179.
Supreme Court of Florida.
March 14, 2002.
*350 James F. Gilbride and Adam D. Horowitz of Gilbride, Heller & Brown, P.A., Miami, FL; and J. Patrick Fitzgerald, Coral Gables, FL, for Petitioners.
May L. Cain and William J. Snihur, Jr. of Cain & Snihur, North Miami Beach, FL, for Respondents.
Peter A. Miller of Conroy, Simberg & Ganon, Coral Gables, Florida; and Law Offices of Robert S. Glazier, Miami, FL, for Miami Shores Presbyterian Church, Amicus Curiae.
Philip M. Burlington of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, FL, for Academy of Florida Trial Lawyers, Amicus Curiae.
PARIENTE, J.
We have for review the Third District Court of Appeal's decision in Doe v. Malicki, *351 771 So.2d 545 (Fla. 3d DCA 2000), which expressly construes the First Amendment of the United States Constitution. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.[1] The issue presented in this case is whether the First Amendment bars a third-party tort action against a religious institution grounded on the alleged tortious act by one of its clergy. We conclude that the First Amendment does not provide a shield behind which a church may avoid liability for harm caused to an adult and a child parishioner arising from the alleged sexual assault or battery by one of its clergy, and accordingly approve the Third District's decision. We thus join the majority of both state and federal jurisdictions that have found no First Amendment bar under similar circumstances.[2]

*352 BACKGROUND
Jane Doe I and Jane Doe II ("parishioners") jointly brought an eight-count lawsuit against Father Jan Malicki ("Malicki"), St. David Catholic Church, and the Archdiocese of Miami (the second two defendants are referred to collectively as "Church Defendants"). The parishioners alleged in their complaint that, at the time of the incident, Jane Doe I was a minor parishioner who worked at St. David in exchange for her tuition to attend St. Thomas Catholic High School,[3] and that Jane Doe II was an adult parishioner who worked at St. David and was under the direct control and supervision of Malicki and the Church Defendants.
The complaint alleges that on numerous occasions, Malicki "fondled, molested, touched, abused, sexually assaulted and/or battered" the parishioners on the premises of St. David. Moreover, Count I also alleges that on numerous occasions, Malicki unlawfully served alcohol to Jane Doe I. Counts I and II set forth claims of negligent hiring, retention, and supervision against the Church Defendants based upon Malicki's conduct. In particular, the complaint alleges that the Church Defendants "knew, or in the exercise of reasonable care, should have known, [that Malicki] was unsuited for teaching, counseling, spiritually guiding, supervising and leading employees and parishioners." Moreover, the parishioners assert that the Church Defendants negligently failed "to make inquiries into Malicki's background, qualifications, reputation, work history, and/or criminal history prior to employing him in the capacity of Associate Pastor." Finally, the parishioners contend that the Church Defendants negligently placed them under the supervision of Malicki, when the Church Defendants either knew or should have known that Malicki had the propensity to commit sexual assaults and molestations.[4]
*353 The Church Defendants moved to dismiss the complaint, arguing, among other claims, that the resolution of these issues would "involve the internal ecclesiastical decisions of the Roman Catholic Church required by Canon Law" and therefore are barred by the First Amendment. Moreover, the Church Defendants argued that the parishioners' negligence claim was improper because the parishioners failed to establish a secular duty and the parishioners failed to establish a sufficient physical injury to establish their emotional damages.
The trial court reached only the First Amendment argument and entered an order granting the Church Defendants' motion to dismiss with prejudice, concluding that the First Amendment barred consideration of the parishioners' claims. On appeal, the Third District reversed and remanded. The Third District framed the issue as whether the Church Defendants had reason to know of Malicki's misconduct and did nothing to prevent reasonably foreseeable harm from being inflicted on the parishioners. See Malicki, 771 So.2d at 548. Because this determination "is one governed by tort law and does not require inquiry into the religious doctrines and practices of the Catholic Church," the Third District concluded that the First Amendment did not bar consideration of the parishioners' claims. Id.
Chief Judge Schwartz wrote a dissenting opinion, in which he took issue with the majority's premise that the resolution of these issues turned on neutral principles of tort law. See id. at 548 (Schwartz, C.J., dissenting). Chief Judge Schwartz stated that it was erroneous to equate "the relationships between the church, its bishops and its priestsand any consequent tort responsibility for hiring, firing, retention and assignment ... to those involving, say, a landlord and the custodian to whom it entrusts the keys to the tenants' apartments." Id. Chief Judge Schwartz reasoned that it would be inconceivable to hold the Church Defendants to the secular standard of a reasonable businessman, and that it would be unconstitutional to hold the Church Defendants to the standard of a reasonable church. See id. at 550. Therefore, Chief Judge Schwartz concluded that the First Amendment barred consideration of the parishioners' claims in this case.

LAW AND ANALYSIS

I. OVERVIEW OF THE FIRST AMENDMENT
The general issue presented in this case is whether, in the name of the First Amendment, religious institutions can be shielded from otherwise cognizable tort claims caused by their agents and employees. In the context of this case, the specific question is whether the First Amendment bars a secular court's consideration of the parishioners' claims of negligent hiring and supervision against the Church Defendants based upon the claim that Malicki "fondled, molested, touched, abused, sexually assaulted and/or battered" the minor and adult parishioners.
The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. The First Amendment, which is one of the hallmarks of our Bill of Rights, contains two clauses regarding religion the Free Exercise Clause and the Establishment Clause. This constitutional guarantee *354 is made applicable to the states through the Fourteenth Amendment. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 757, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).
The Free Exercise Clause guarantees "first and foremost, the right to believe and profess whatever religious doctrine one desires." Employment Div. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Moreover, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).
The United States Supreme Court has explained that the Free Exercise Clause "embraces two conceptsfreedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." Cantwell v. Connecticut, 310 U.S. 296, 303-04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Thus, the First Amendment has never been interpreted to mean that "when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from government regulation." Smith, 494 U.S. at 882, 110 S.Ct. 1595. Government regulation includes both statutory law and court action through civil lawsuits. See Kreshik v. Saint Nicholas Cathedral, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960).
Importantly, before the constitutional right to free exercise of religion is implicated, the threshold inquiry is whether the conduct sought to be regulated was "rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); see Sanders v. Casa View Baptist Church, 134 F.3d 331, 337-38 (5th Cir.1998); Destefano v. Grabrian, 763 P.2d 275, 283-84 (Colo.1988). Further, in order to launch a free exercise challenge, it is necessary "to show the coercive effect of the enactment as it operates against [the individual] in the practice of his religion." School Dist. v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).
If it is demonstrated that the conduct at issue was rooted in religious beliefs, then the court must determine whether the law regulating that conduct is neutral both on its face and in its purpose. See Lukumi Babalu, 508 U.S. at 531, 113 S.Ct. 2217. "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." Id. at 533, 113 S.Ct. 2217 (citation omitted).
The State may, however, regulate conduct through neutral laws of general applicability. See id. at 531, 113 S.Ct. 2217. Thus, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Id. at 531, 113 S.Ct. 2217.
The second aspect of the First Amendment religion clause, the Establishment Clause, states that government "shall make no law respecting an establishment of religion." U.S. Const. amend. I. This aspect of the First Amendment involves the separation of church and state and prevents the government from passing laws that "aid one religion, aid all religions, *355 or prefer one religion over the other." Schempp, 374 U.S. at 216, 83 S.Ct. 1560.
The United States Supreme Court has explained that there are "three main evils against which the Establishment Clause was intended to afford protection: `sponsorship, financial support, and active involvement of the sovereign in religious activity.'" Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (quoting Walz v. Tax Comm'n, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). In Lemon, the Court provided a three-part test to determine whether a neutral law violates the Establishment Clause: (1) the law must have a secular legislative purpose; (2) the primary or principal effect of the law must neither advance nor inhibit religion; and (3) the law must not foster an excessive government entanglement with religion. 403 U.S. at 612-13, 91 S.Ct. 2105. More recent cases examining the Establishment Clause have clarified that excessive government entanglement is merely a factor to consider in evaluating the second prong; that is, whether the principal effect of the statute is to advance or inhibit religion. See Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000); Agostini v. Felton, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).[5]
As particularly relevant to the analysis of the First Amendment challenge in this case, the Supreme Court has also held that the First Amendment prevents courts from resolving internal church disputes that would require adjudication of questions of religious doctrine.[6]See Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 708-09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 107-08, 73 S.Ct. 143, 97 L.Ed. 120 (1952). For example, the Supreme Court has stated that "it is not within `the judicial function and judicial competence'" of civil courts to determine which of two competing *356 interpretations of scripture are correct. United States v. Lee, 455 U.S. 252, 256, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). Instead, civil courts must defer to the interpretations of religious doctrine made by the "highest ecclesiastical tribunal." Serbian E. Orthodox Diocese, 426 U.S. at 709, 96 S.Ct. 2372. Thus, the First Amendment provides churches with the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Kedroff, 344 U.S. at 116, 73 S.Ct. 143; see Serbian E. Orthodox Diocese, 426 U.S. at 724-25, 96 S.Ct. 2372.
In Kedroff, the Supreme Court held unconstitutional a New York state statute passed specifically to address an intra-church property dispute. 344 U.S. at 121, 73 S.Ct. 143. Moreover, in Serbian E. Orthodox Diocese, the Supreme Court held that the Illinois Supreme Court had no authority, consistent with the First Amendment, to adjudicate a dispute concerning a priest's defrockment by the mother church. 426 U.S. at 724-25, 96 S.Ct. 2372. In reversing the judgment of the state court, the Supreme Court explained:
The fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes.... "To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide ... religious law [governing church polity]... would violate the First Amendment in much the same manner as civil determination of religious doctrine." For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.
Id. at 708-09, 96 S.Ct. 2372 (emphasis added) (citations omitted) (quoting Maryland & Va. Eldership v. Church of God, 396 U.S. 367, 369, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring)).
Intrachurch disputes, however, must be distinguished from disputes between churches and third parties. As then Justice Rehnquist observed, in rejecting the argument by the United Methodist Church that the Free Exercise Clause barred the Court's exercise of jurisdiction in a civil dispute involving a third party:
In my view, applicant plainly is wrong when it asserts that the First and Fourteenth Amendments prevent a civil court from independently examining, and making the ultimate decision regarding, the structure and actual operation of a hierarchical church and its constituent units in an action such as this. There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes. See Serbian Eastern Orthodox Diocese .... But this Court has never suggested that those constraints similarly apply outside the context of such intraorganization disputes.... [Serbian Eastern Orthodox Diocese and other related cases] are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf *357 of groups espousing particular doctrinal beliefs. Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.

General Council on Fin. & Admin. v. California Superior Court, 439 U.S. 1355, 1372-73, 99 S.Ct. 35, 58 L.Ed.2d 63 (Rehnquist, Circuit Justice 1978) (emphasis added).
A court thus must determine whether the dispute "is an ecclesiastical one about `discipline, faith, internal organization, or ecclesiastical rule, custom or law,' or whether it is a case in which [it] should hold religious organizations liable in civil courts for `purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization.'" Bell v. Presbyterian Church, 126 F.3d 328, 331 (4th Cir.1997) (quoting Serbian E. Orthodox Diocese, 426 U.S. at 713, 96 S.Ct. 2372; and General Council, 439 U.S. at 1373, 99 S.Ct. 35). See also Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. at 449, 89 S.Ct. 601 ("[T]here are neutral principles of law, developed for use in all property disputes, which can be applied without `establishing' churches to which the property is awarded.")
From this overview of the applicable United States Supreme Court precedent, it is clear that although the Free Exercise and Establishment Clauses protect different interests, the analysis under the two clauses is intertwined. Thus, both clauses of the First Amendment must be analyzed in determining whether the reach of the constitutional protection extends to what amounts to an immunity from a tort claim where the religious institution is a defendant. Although an entanglement inquiry is associated with the adjudication of an Establishment Clause claim, the extent to which the courts will be called upon to determine matters of church practice also implicates the Free Exercise Clause. With this framework in mind, we turn to the split of authority among the jurisdictions that have considered the issue presented in this case.

II. SPLIT OF AUTHORITY
The United States Supreme Court has not yet resolved the issue of whether the First Amendment protects a religious institution from liability when a church employee engages in tortious conduct against a third-party, whether it arises from sexual assault and battery of a minor and an adultas in this caseor whether it arises in the context of adult counseling, as in many other cases.[7] The question unanswered thus far by the United States Supreme Court is how far the religious autonomy principle of Kedroff and Serbian E. Orthodox Diocese may be extended to bar the adjudication of a third-party tort claim that calls into question a religious institution's acts or omissions.
Courts that have addressed this issue are divided. As the Third District observed in this case:

*358 In recent years courts throughout the nation have confronted the issue of a religious institution's liability in response to increased litigation arising from allegations of sexual misconduct by members of the clergy. Various theories of liability have been used in an attempt to resolve any First Amendment entanglement problem. And, not surprisingly given the delicate balance between religious freedom and the protection of the public safety, there is considerable diversity in the judicial analysis employed by the different courts. See Joseph B. Conder, Liability of Church or Religious Society for Sexual Misconduct of Clergy, 5 A.L.R. 5th 530 (1993).
Malicki, 771 So.2d at 546.
Substantial authority in both the state and federal courts concludes that the right to religious freedom and autonomy protected by the First Amendment is not violated by permitting the courts to adjudicate tort liability against a religious institution based on a claim that a clergy member engaged in tortious conduct such as sexual assault and battery in the course of his or her relationship with a parishioner.[8] These courts conclude that there is no impermissible interpretation of religious doctrine because the courts are applying a neutral principle of generally applicable tort law.[9] This is especially so where the religious institution does not allege that the conduct was undertaken in furtherance of a sincerely held religious belief. See Sanders, 134 F.3d at 338 n. 7; Destefano, 763 P.2d at 284. Thus, the Colorado Supreme Court has reasoned that "[i]n the spiritual counseling context, the free exercise clause is relevant only if the defendant can show that the conduct that allegedly caused plaintiff's distress was in fact `part of the belief and practices' of the religious group." Destefano, 763 P.2d at 283-84; see Sanders, 134 F.3d at 337-38; MacDonell, 696 A.2d at 702. Moreover, it has been asserted that a contrary holding actually places a church or its clergy in a preferred position of being immune from tort liability solely because of religion, which in itself would have the impermissible effect of recognizing a religion in violation of the Establishment Clause. See Smith v. O'Connell, 986 F.Supp. 73, 80 (D.R.I.1997) (citing City of Boerne v. Flores, 521 U.S. 507, 537, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (Stevens, J., concurring)); Smith v. Raleigh Dist., 63 F.Supp.2d 694, 716 n. 18 (E.D.N.C.1999).
On the other hand, there is contrary authority from some state and federal courts that concludes that any tort claim against a religious institution founded on negligent hiring or supervision or breach of fiduciary duty is barred because the adjudication of the tort dispute would necessarily involve an examination of the religious institution's method of hiring, supervising, and disciplining its clergy, thus interfering with its religious autonomy.[10] These courts reason that the evaluation *359 of these claims would impermissibly interfere with the right of the church to determine standards governing the relationship between the church and its clergy.

III. DOE V. EVANS

In contrast to the Third District's broad holding that an inquiry into the negligent hiring decision "is one governed by tort law," Malicki, 771 So.2d at 548, the Fourth District has held that the First Amendment bars consideration of claims for negligent hiring and supervision and breach of fiduciary duty against a church and a diocese where a pastor allegedly engaged in a sexual relationship with a parishioner during the course of a marital counseling relationship. See Doe v. Evans, 718 So.2d 286, 289-92 (Fla. 4th DCA 1998). In Evans, the Fourth District, in interpreting the First Amendment, appears to have adopted an approach based on the criminality of the underlying conduct of the clergy member. Under the Fourth District's analysis, a tort claim for negligent hiring and supervision and breach of fiduciary duty against a religious institution would be allowed only if the underlying conduct of the clergy involved criminal behavior.[11] As the Fourth District explained:

*360 In any event, we are persuaded that just as the State may prevent a church from offering human sacrifices, it may protect its children against injuries caused by pedophiles by authorizing civil damages against a church that knowingly (including should know) creates a situation in which such injuries are likely to occur. We recognize that the State's interest must be compelling indeed in order to interfere in the church's selection, training and assignment of its clerics. We would draw the line at criminal conduct.

Id. at 289 (quoting the Fifth District's dicta in Doe v. Dorsey, 683 So.2d 614, 617 (Fla. 5th DCA 1996)). In affirming the dismissal of the complaint based on First Amendment principles, the Fourth District expressed its view that a relationship between parishioner and pastor in which the allegations fall short of alleging criminal conduct presented a "less compelling factual scenario" than cases involving criminal assaults, especially against children. 718 So.2d at 289-90.

IV. NEGLIGENT HIRING AND SUPERVISION
The Church Defendants in this case assert that despite the fact that one of the plaintiffs is alleged to be a child victim of criminal sexual assault and battery, the First Amendment shields the church from tort liability because the inquiry for negligent hiring and supervision necessarily implicates church practices and doctrine. In other words, they assert that the First Amendment bars the tort claims at issue here because evaluating the "reasonableness" of their decisions regarding the hiring or supervision of Malicki would excessively entangle the civil courts in the internal workings of the church.
The Miami Shores Presbyterian Church, in an amicus brief filed in this case, urges that we reject the analytical framework of Evans and Dorsey, which would allow negligent hiring and supervision cases to proceed only if the underlying conduct of the clergy member was criminal. The Miami Shores Presbyterian Church asserts, and our research confirms, that this "criminality distinction appears in practically no law outside of Florida." Rather, the position of amicus is that every negligent hiring and supervision lawsuit intrudes into core constitutionally protected areas and the "proposed exception is undefined and will be difficult to apply."
We reject the contention that the First Amendment may be invoked to bar the adjudication of this dispute because this case is not an internal church matter. Rather, this is a dispute between church officials and two parishioners who allege that they were injured as a result of the negligence of the church officials.
A law establishing standards of conduct does not implicate the Free Exercise Clause unless adherence to those standards interferes with religious belief or activity. See Lukumi Babalu Aye, 508 U.S. at 532, 113 S.Ct. 2217. Thus, the "threshold inquiry is whether there is a conflict between conduct that is required by law and conduct that is prohibited by religious principles." Smith v. O'Connell, 986 F.Supp. at 78.
In this case, the Church Defendants do not claim that the underlying acts of its priest in committing sexual assault *361 and battery was governed by sincerely held religious beliefs or practices. Nor do they claim that the reason they failed to exercise control over Malicki was because of sincerely held religious beliefs or practices. Therefore, it appears that the Free Exercise Clause is not implicated in this case because the conduct sought to be regulated; that is, the Church Defendants' alleged negligence in hiring and supervision is not rooted in religious belief. Moreover, even assuming an "incidental effect of burdening a particular religious practice," the parishioners' cause of action for negligent hiring and supervision is not barred because it is based on neutral application of principles of tort law. See Lukumi Babalu Aye, 508 U.S. at 531, 113 S.Ct. 2217.
Through neutral application of principles of tort law, we thus give no greater or lesser deference to tortious conduct committed on third parties by religious organizations than we do to tortious conduct committed on third parties by non-religious entities.[12] For example, Florida courts, as well as courts in other jurisdictions, have applied neutral principles of tort law to religious institutions in premises liability cases.[13]
With regard to the tort of negligent supervision, this Court recognized the viability of the common law cause of action for the negligent supervision of an employee more than forty-five years ago. See Mallory v. O'Neil, 69 So.2d 313, 315 (Fla.1954).[14] The rule articulated in Mallory *362 has evolved to encompass the tort of negligent hiring as well as negligent supervision.[15]See Garcia v. Duffy, 492 So.2d 435, 438 (Fla. 2d DCA 1986). To bring a prima facie case for negligent hiring, a plaintiff must demonstrate that:
(1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known.
Id. at 440.
These are the primary factual inquiries of the negligent hiring count in this case. For example, the parishioners assert that the Church Defendants negligently failed "to make inquiries into Malicki's background, qualifications, reputation, work history, and/or criminal history prior to employing him in the capacity of Associate Pastor." As to the negligent supervision claim, the parishioners contend that the Church Defendants negligently placed them under the supervision of Malicki, when the Church Defendants either knew or should have known that Malicki had the propensity to commit sexual assaults and molestations. These allegations are the classic elements of negligent hiring and negligent supervision claims.
The core predicate for imposing liability is one of reasonable foreseeability the cornerstone of our tort law. See generally McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992). With regard to the claim for negligent hiring, the inquiry is focused on whether the specific danger that ultimately manifested itself (e.g., sexual assault and battery) reasonably could have been foreseen at the time of hiring. See Van Osdol v. Vogt, 908 P.2d 1122, 1132-33 (Colo.1996).
In rejecting a similar First Amendment challenge[16] to a claim for negligent hiring of a clergy member, the Colorado Supreme Court explained:

*363 While claims for illegal hiring or discharge of a minister inevitably involve religious doctrine, that is not the case for a claim of negligent hiring of a minister. The claim of negligent hiring is brought after an employee has harmed a third party through his or her office of employment. An employer is found liable for negligent hiring if, at the time of hiring, the employer had reason to believe that hiring this person would create an undue risk of harm to others. Hence, the court does not inquire into the employer's broad reasons for choosing this particular employee for the position, but instead looks to whether the specific danger which ultimately manifested itself could have reasonably been foreseen at the time of hiring.

Bear Valley Church, 928 P.2d at 1323 (citations omitted) (quoting Van Osdol, 908 P.2d at 1132 n. 17) (emphasis added).
Similarly, in finding that the Free Exercise Clause does not bar a claim for negligent supervision against a church for the sexual misconduct of its priest, the United States District Court for the District of Connecticut stated:
The court's determination of an action against the defendants based upon their alleged negligent supervision of [the priest] would not prejudice or impose upon any of the religious tenets or practices of Catholicism. Rather, such a determination would involve an examination of the defendants' possible role in allowing one of its employees to engage in conduct which they, as employers, as well as society in general expressly prohibit. Since the Supreme Court has consistently failed to allow the Free Exercise Clause to "relieve[ ][an] individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs," the defendants cannot appropriately implicate the First Amendment as a defense to their alleged negligent conduct.
Nutt v. Norwich Roman Catholic Diocese, 921 F.Supp. 66, 74 (D.Conn.1995) (quoting Minersville School Dist. v. Gobitis, 310 U.S. 586, 594, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940)).
In its reasoning in Evans, the Fourth District appears to have assumed that a First Amendment violation will occur any time a court may be required to either review or interpret church doctrine and that the only basis for a court to interfere in a church-related dispute is if the State's interest is compelling. However, the United States Supreme Court has not extended the religious autonomy principle as articulated in Kedroff and Serbian E. Orthodox Diocese to disputes beyond strictly ecclesiastical intrachurch disputes that have been resolved through an ecclesiastical tribunal. In addition, resolution of the dispute would have to involve "extensive inquiry" into religious law and polity before the First Amendment would bar a secular court from adjudicating a civil dispute. Serbian E. Orthodox Diocese, 426 U.S. at 709, 96 S.Ct. 2372.
The religious autonomy principle is further inapplicable in a case such as this, where "the court does not run the risk of displacing the free religious choices of defendants by placing its weight behind a particular religious belief." Raleigh Dist., 63 F.Supp.2d at 709. As the United States Court of Appeal for the Fifth Circuit succinctly explained:
The First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships....
Instead, the Free Exercise Clause protects religious relationships ... by preventing the judicial resolution of ecclesiastical *364 disputes turning on matters of "religious doctrine or practice."
Sanders, 134 F.3d at 335-36. Therefore, for all these reasons, we conclude that the Free Exercise Clause does not bar consideration of the parishioners' claims for negligent hiring and supervision as alleged in their complaint.
Moreover, the Establishment Clause does not bar these causes of action because the imposition of tort liability in this case has a secular purpose and the primary effect of imposing tort liability based on the allegations of the complaint neither advances nor inhibits religion. The core inquiry in determining whether the Church Defendants are liable will focus on whether they reasonably should have foreseen the risk of harm to third parties. This is a neutral principle of tort law. Therefore, based on the allegations in the complaint, we do not foresee "excessive" entanglement in internal church matters or in interpretation of religious doctrine or ecclesiastical law.
Finally, we reject the distinction that the Fourth District drew in Evans, 718 So.2d at 289-90, that would apparently allow a negligent supervision claim against a church defendant only if the underlying sexual misconduct involved criminal activity (e.g., sexual assault and battery, as in this case). As the United States Supreme Court explained in Lukumi Babalu Aye and Smith, strict scrutiny will not be triggered by neutral laws of general applicability that are not intended to "infringe upon or restrict practices because of their religious motivation." Lukumi Babalu Aye, 508 U.S. at 533, 113 S.Ct. 2217; see Smith, 494 U.S. at 884-85, 110 S.Ct. 1595. Moreover, this "neutral principles of law" doctrine applies in both the criminal and the civil context.[17]
Whether the priest's tortious conduct in this case involved improper sexual relations with an adult parishioner he was counseling or sexual assault and battery of a minor, the necessary inquiry in the claim against the Church Defendants is similarly framed: whether the Church Defendants had reason to know of the tortious conduct and did nothing to prevent reasonably foreseeable harm from being inflicted upon the plaintiffs. Because the underlying claim arises from the alleged sexual assault and battery of a minor and adult parishioner by a priest, and because the claim for negligence involves whether the Church Defendants knew or should have known of the tortious conduct, we conclude that the First Amendment may not be invoked to bar the parishioners from seeking redress for the alleged tortious conduct of the Church Defendants.[18]

*365 CONCLUSION
We recognize that the Free Exercise Clause and the Establishment Clause require constant vigilance to prevent the government from either stifling the free exercise of religion or excessively and impermissibly entangling itself with interpreting religious doctrine on matters solely within the purview of religious institutions. However, with regard to a third party tort claim against a religious institution, we conclude that the First Amendment does not provide a shield behind which a church may avoid liability for harm arising from an alleged sexual assault and battery by one of its clergy members.
By holding that the First Amendment does not bar the court's consideration of the parishioners' allegations, we expressly do not pass on the merits of the underlying case. Our holding today is only that the First Amendment cannot be used at the initial pleading stage to shut the courthouse door on a plaintiff's claims, which are founded on a religious institution's alleged negligence arising from the institution's failure to prevent harm resulting from one of its clergy who sexually assaults and batters a minor or adult parishioner.[19] To hold otherwise and immunize the Church Defendants from suit could risk placing religious institutions in a preferred position over secular institutions, a concept both foreign and hostile to the First Amendment. Accordingly, we approve the decision below, disapprove of the Fourth District's decision in Evans, and remand for further proceedings consistent with this opinion.
It is so ordered.
SHAW, ANSTEAD, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., concurs in result only with an opinion.
QUINCE, J., concurs specially with an opinion.
HARDING, J., dissents with an opinion.
*366 WELLS, C.J., concurring in result only.
I concur in result only in this decision which, when stripped of substantial dicta, is stated in the opinion's third from final sentence:
Our holding today is only that the First Amendment cannot be used at the initial pleading stage to shut the courthouse door on a plaintiffs claims, which are founded on a religious institution's alleged negligence arising from the institution's failure to prevent harm resulting from one of its clergy who sexually assaults and batters a minor or adult parishioner.
Majority op. at 365 (emphasis added). I expressly do not join in what I conclude is overly broad and imprecise language in the opinion, such as use of the term "tortious conduct," which is otherwise undefined and ambiguous as to tort law meaning.
I would limit the liability of the religious organization by finding a specific bright-line exception to the First Amendment bar of secular court involvement to allegations and proof of criminal sexual assault and battery. See Doe v. Dorsey, 683 So.2d 614 (Fla. 5th DCA 1996). I am in agreement with much of the well-reasoned opinion of Judge Polen in Doe v. Evans, 718 So.2d 286 (Fla. 4th DCA 1998), although I question whether the allegations of the operative complaint in that case even state a cause of action to be evaluated for a First Amendment bar. I would also adopt the exception as stated in Dorsey.
I do have a very real concern about the breadth and imprecise language of the majority opinion. My concern is that the religious organizations in this state are going to be severely financially burdened by having to defend claims for undefined and unlimited "tortious conduct" which claim to be grounded upon the majority opinion. The problem I foresee is that the vagueness of this language, which does not define the elements of any torts or draw lines for which conduct is actionable, will particularly burden religious organizations because these are the organizations that provide these counseling services on an affordable basis.
Certainly, I in no way condone abusive sexual conduct, whether it takes place in a religious organization or elsewhere. However, I believe that this Court should recognize that by its opinion in this case and by quashing Doe v. Evans, 718 So.2d 286 (Fla. 4th DCA 1998), it is placing in severe jeopardy these counseling programs provided by religious organizations in this state. These organizations provide real, beneficial, and needed services that the citizens using these services will not otherwise find available. The costs of defending claims founded upon the language of this opinion will simply make the financial burden of providing the services too great.
With the express limited exception stated in this opinion, I concur with the reasoning of Justice Harding.
QUINCE, J., specially concurring.
While I fully agree with the majority opinion in this case, I write to address the concerns articulated by Chief Justice Wells in his concurring in result only opinion. He opines that the majority's decision may result in religious institutions becoming "severely financially burdened" by being forced to defend tort claims brought against them based on the actions of their employees against third party plaintiffs. Concurring in result only op. of Wells, C.J., at 366. Furthermore, he contends that our decision makes the risk of defending these types of claims too great to continue to offer counseling services.
I agree with Chief Justice Wells that religious organizations provide beneficial services to the citizens of Florida. However, *367 I fail to see how placing religious organizations on the same playing field as secular institutions for the purposes of tort liability will result in a severe financial burden for these organizations. Today's opinion simply holds that when religious organizations undertake to provide services to the public, they have a duty to protect the citizens who use those services from the tortious conduct of their employees.
Additionally, Chief Justice Wells' assertion that religious organizations will be severely financially burdened by subjecting them to tort liability does not take into account the fact that religious organizations, like secular organizations, carry insurance policies to protect against the expense of defending claims based upon the acts of their employees. See, e.g., Evangelical Lutheran Church in America v. Atlantic Mut. Ins. Co., 169 F.3d 947, 951 (5th Cir.1999) (holding that church synod's allegedly negligent training, supervision, and placement of minister who allegedly committed sexual assault constituted an "occurrence" within the meaning of synod's CGL and umbrella insurance policies); Melendez v. Commercial Union Ins. Co., No. 3:94CV00776(AVC), 2000 WL 303434 (D.Conn. Feb.8, 2000) (recognizing insurance policy covering church for sexual misconduct of its priest); Bohrer v. Church Mut. Ins. Co., 965 P.2d 1258 (Colo.1998) (holding that religious organization's insurance policy covered a minister's alleged sexual misconduct).
In essence, one of Chief Justice Wells' assertions is that religious organizations, based on that status alone and without any demonstration that these tort claims unduly infringe on the religious tenets of the organizations, should be given preferential legal treatment. However, as the majority points out, shielding religious organizations from tort liability solely because of their status would have the impermissible effect of recognizing a religion in violation of the Establishment Clause. Smith v. O'Connell, 986 F.Supp. 73, 80 (D.R.I.1997) (citing City of Boerne v. Flores, 521 U.S. 507, 537, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (Stevens, J., concurring)).[20] Such a recognition of religion would, in my opinion, violate the principles of the First Amendment of the United States Constitution and article I, section 3 of the Florida Constitution.
HARDING, J., dissenting.
While I recognize that the First Amendment does not shield a religious institution against all vicarious liability arising from the tortious actions of its employees, I dissent because allowing a tort claim for negligent hiring and supervision against the hierarchy of a religious institution would necessarily require a secular court to impermissibly interpret the religious institution's law, policies, and practices. Such intrusion into the internal affairs of the churchor any other religious institution would amount to excessive entanglement of religion by the state and, therefore, such a claim is barred by the First Amendment.
In reaching its conclusion, the majority generally undervalues the First Amendment concerns at stake and specifically overlooks the undeniable, and constitutionally violative, result that secular standards of care and duties will be unilaterally imposed upon the ecclesiastical hierarchy. "Defining such a duty would necessarily require a court to express the standard of care to be followed by other reasonable *368 clerics in the performance of their ecclesiastical counseling duties, which, by its very nature, would embroil the courts in establishing the training, skill, and standards applicable for members of the clergy in this state in a diversity of religions professing widely varying beliefs." Franco v. Church of Jesus Christ of Latter-Day Saints, 21 P.3d 198, 206 (Utah 2001).
To determine that a church negligently installed or transferred a particular pastor is effectively to override the church's prior decision in this regard and to impermissibly dictate the church's or its congregation's decision-making in the future, and it interferes with a church's freedom to interact with its own clergy. Moreover, "judicial inquiry into the hiring, ordaining, and retaining of clergy would result in an endorsement of religion `by approving one model for church hiring, ordination, and retention of clergy.'" Doe v. Evans, 718 So.2d 286, 290 (Fla. 4th DCA 1998) (quoting Gibson v. Brewer, 952 S.W.2d 239, 247 (Mo.1997)).[21]
While I recognize that, arguably, two of the most authoritarian structures of human existencereligion and stateare not static structures, a closer examination into the nature of the dispute is required before eviscerating the independent significance of religion in our Constitution. As such, I find the majority's conclusion is falsely premised on the notion that the instant case is a "purely secular" dispute "between church officials and a third person" and, therefore, not violative of the First Amendment. While it is true that the pleading caption in the instant case does identify a dispute between church officials and a third a party, a closer inquiry reveals that the nature of the dispute in this instance, i.e., negligent hiring and supervision, implicates a secular examination into "intra-church" process and procedure; an action proscribed by our Constitution.
In rejecting a claim similar to the one posed here against a Presbyterian church for the negligent placement, retention, or supervision of one of its pastors for the alleged sexual misconduct against a twelve-year-old, then Chief Judge Brieant of the Southern District of New York noted:
[A]ny inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement ... [and] might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs. Insofar as concerns retention or supervision, the pastor of a Presbyterian Church is not analogous to a common law employee. He may not demit his charge nor be removed by the session, without the consent of the presbytery, functioning essentially as an ecclesiastical court. The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millenia. As the Supreme Court stated long before the Lemon formulation was developed:
It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as *369 the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.
It would therefore also be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant Bishop. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause.
Schmidt v. Bishop, 779 F.Supp. 321, 332 (S.D.N.Y.1991) (citations omitted) (quoting Watson v. Jones, 80 U.S. (13 Wall.) 679, 729, 20 L.Ed. 666 (1871)).
Furthermore, the majority's reliance on statements by then Justice Rehnquist in General Council on Fin. & Admin. v. California Superior Court, 439 U.S. 1369, 1372-73, 99 S.Ct. 35, 58 L.Ed.2d 63 (Rehnquist, Circuit Justice 1978) is also misplaced. In General Council, then Justice Rehnquist said the Free Exercise Clause does not bar the Court's exercise of jurisdiction in a civil dispute between churches and third parties. See General Council, 439 U.S. at 1372-73, 99 S.Ct. 35. His conclusion, however, is expressly limited to "purely secular disputes between third parties ... [and religious organizations]... in which fraud, breach of contract, and statutory violations are alleged." Id. at 1373, 99 S.Ct. 35. Such an inquiry would be primarily concerned with the inter-relationship between the third party and the church, and allegations of fraud, breach of contract, or statutory violations would not necessarily require a secular examination of intra-church policy and practice. Those circumstances are not present here.
To support its assertion that the instant claim is "based upon a neutral principles of law" and, therefore, not barred, the majority cites to Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Reliance on this case, however, is also misplaced. In Presbyterian Church, the Court examined "whether the restraints of the First Amendment ... permit a civil court to award church property on the basis of the interpretation and significance the civil court assigns to aspects of church doctrine." Id. at 441, 89 S.Ct. 601. Although the Supreme Court stated, and the majority in the instant case noted, "there are neutral principles of law... which can be applied without `establishing' churches to which property is awarded," Id. at 449, 89 S.Ct. 601, the Court also recognized that "[s]pecial problems arise ... when these disputes implicate controversies over church doctrine and practice." Id. at 445, 89 S.Ct. 601. Thus, when a Georgia court interpreted particular church doctrines and the importance of those doctrines to the religion, it "violated the command of the First Amendment." Id. at 449, 89 S.Ct. 601. The Court concluded that:
First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concerns.
Id. at 449, 89 S.Ct. 601.
While I recognize there are some courts which have found no First Amendment bar to claims similar to the ones at issue here, *370 I would instead, for the reasons mentioned above, join the large number of jurisdictions which have concluded that allowing a tort claim for negligent hiring and supervision against a religious organization violates the First Amendment of our Constitution.[22]
NOTES
[1] Petitioners also invoke our jurisdiction based on express and direct conflict with the Fourth District Court of Appeal's decision in Doe v. Evans, 718 So.2d 286 (Fla. 4th DCA 1998), review granted, 735 So.2d 1284 (Fla. 1999), which we also have pending on review. See art. V, § 3(b)(3), Fla. Const.
[2] State cases: Colorado: Bear Valley Church of Christ v. DeBose, 928 P.2d 1315, 1323 (Colo.1996) (holding the First Amendment not a bar to child's various tort claims against pastor and church for "pattern of inappropriate touching" that arose during counseling relationship); Moses v. Diocese of Colorado, 863 P.2d 310, 314-15 (Colo.1993) (holding First Amendment no bar to adult parishioner's claims against bishop and diocese for breach of fiduciary duty and negligent hiring and supervision grounded on sexual relationship between parishioner and priest during the course of counseling); Destefano v. Grabrian, 763 P.2d 275, 283-88 (Colo.1988) (same); Illinois: Amato v. Greenquist, 287 Ill.App.3d 921, 223 Ill.Dec. 261, 679 N.E.2d 446, 450, 454 (1997) (Illinois does not recognize claim of breach of fiduciary duty based upon relationship between cleric and parishioner because religion is the foundation of the claim, but recognizing that negligent supervision claim may not be barred by First Amendment); Bivin v. Wright, 275 Ill.App.3d 899, 212 Ill.Dec. 287, 656 N.E.2d 1121, 1124-25 (1995) (recognizing that claim brought by husband and wife against church alleging negligent supervision of minister who engaged in sexual relationship with wife during the course of marital counseling is not barred by First Amendment); Indiana: Konkle v. Henson, 672 N.E.2d 450, 456 (Ind.Ct.App. 1996) (holding that child victim of sexual molestation could bring claim of negligent hiring and supervision against church); Minnesota: Mrozka v. Archdiocese of St. Paul and Minneapolis, 482 N.W.2d 806, 812 (Minn.Ct.App. 1992) (holding that First Amendment is not violated by the imposition of punitive damages against church based upon priest's sexual abuse of child); New Jersey: F.G. v. MacDonell, 150 N.J. 550, 696 A.2d 697, 702-03 (1997) (holding that First Amendment does not bar breach of fiduciary duty claim against priest who engaged in sexual relationship with adult parishioner during counseling); New York: Kenneth R. v. Roman Catholic Diocese, 229 A.D.2d 159, 654 N.Y.S.2d 791, 795-96 (1997) (holding that child's negligent supervision and retention claims against diocese not barred by First Amendment); but see Langford v. Roman Catholic Diocese, 271 A.D.2d 494, 705 N.Y.S.2d 661, 662 (N.Y.App. Div.2000) (holding that parishioner's breach of fiduciary duty claim against member of the clergy in connection with sexual relationship during the course of spiritual counseling was tantamount to impermissible clergy malpractice claim); North Carolina: Smith v. Privette, 128 N.C.App. 490, 495 S.E.2d 395, 398 (1998) (holding adult's claim of negligent retention and supervision against church arising out of alleged "inappropriate, unwelcome, offensive and nonconsensual acts of a sexual nature" by minister not barred by First Amendment); Ohio: Byrd v. Faber, 57 Ohio St.3d 56, 565 N.E.2d 584, 589 (1991) (recognizing that negligent hiring claim may not violate First Amendment, but that complaint must plead the operative facts with particularity); Oregon: Erickson v. Christenson, 99 Or.App. 104, 781 P.2d 383, 386 (1989) (holding that First Amendment did not bar tort claims against church for actions of pastor who engaged in sexual relations with plaintiff during course of counseling relationship when plaintiff was a minor); Texas: Martinez v. Primera Asemblea de Dios, Inc., No. 05-96-01458, 1998 WL 242412, at *3 (Tex.Ct.App. May 15, 1998) (holding that First Amendment did not bar parishioner's negligence claims against church based upon allegations that church elder sexually assaulted her); but see Hawkins v. Trinity Baptist Church, 30 S.W.3d 446, 453 (Texas Ct.App.2000) (declining to recognize breach of fiduciary duty claim against pastor for sexual relationship with adult parishioner during the course of marital counseling because of "concerns towards treading upon the Free Exercise Clause"); Washington: C.J.C. v. Corporation of the Catholic Bishop of Yakima, 138 Wash.2d 699, 985 P.2d 262, 277 (1999) (holding that First Amendment did not bar minor sexual abuse victim from bringing tort claims against priest and church).

Federal cases: Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409 (2d Cir.1999) (holding Free Exercise Clause did not bar finding of fiduciary relationship between diocese and parishioner for child sexual abuse by priest); Smith v. O'Connell, 986 F.Supp. 73, 80 (D.R.I.1997) (holding First Amendment did not bar minor's claim of sexual molestation against priest and church for negligent supervision); Doe v. Hartz, 970 F.Supp. 1375, 1431-32 (N.D.Iowa 1997) (holding negligent supervision claim brought by adult who claimed improper sexual contact by priest not barred by First Amendment; however, First Amendment did bar negligent hiring claim), rev'd on other grounds, 134 F.3d 1339 (8th Cir.1998); Sanders v. Casa View Baptist Church, 898 F.Supp. 1169, 1175 (N.D.Tex.1995) (holding First Amendment no bar to claims of professional negligence and breach of fiduciary duty brought by church employee who had counseling relationship with minister), aff'd, 134 F.3d 331 (5th Cir. 1998); Nutt v. Norwich Roman Catholic Diocese, 921 F.Supp. 66 (D.Conn.1995) (holding Free Exercise Clause does not bar claim for negligent employment based upon alleged sexual abuse of altar boys by priest); Isely v. Capuchin Province, 880 F.Supp. 1138, 1151 (E.D.Mich.1995) (holding no First Amendment bar to claim of negligent supervision by student sexual abuse victim, but First Amendment does bar claim of negligent hiring).
[3] The Archdiocese of Miami, in conjunction with St. Thomas Catholic High School, owns and manages St. Thomas.
[4] Because this case is before us on the dismissal of a complaint, we must accept all well-pled allegations of the complaint as true. See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So.2d 306, 309 n. 3 (Fla.2000); Stone v. Wall, 734 So.2d 1038, 1039 (Fla.1999).
[5] We note that several U.S. Supreme Court Justices have expressed dissatisfaction with the Lemon test, advocating an alternative analytical framework for evaluating First Amendment claims. See, e.g., Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (advocating and applying a coercion-accommodation test); Lynch v. Donnelly, 465 U.S. 668, 691, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (advocating adoption of an endorsement test). But see Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 766-67, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), plurality opinion by Scalia, J., joined by Rehnquist, C.J., and Kennedy and Thomas, JJ., (rejecting endorsement test because it "exiles private religious speech to a realm of less-protected expression.... [T]he Establishment Clause ... was never meant ... to serve as an impediment to purely private religious speech connected to the State only through its occurrence in a public forum."). However, we must continue to apply the Lemon test until the U.S. Supreme Court reaches a consensus on the successor to the Lemon test.
[6] This protection has been referred to as the religious autonomy principle. See Smith v. O'Connell, 986 F.Supp. 73, 76 (D.R.I.1997). Although the United States Supreme Court has often discussed this principle in the context of the Free Exercise Clause, see United States v. Lee, 455 U.S. 252, 256, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 107-08, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the United States Supreme Court has also referred to this principle in the context of the Establishment Clause. See Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). It is apparent that the religious autonomy principle articulated by the United States Supreme Court may implicate both the Free Exercise Clause and the Establishment Clause.
[7] The difference in the result reached by courts engaged in the analysis of whether the First Amendment would bar a negligence claim against a religious institution may stem in part from the fact that "[i]t is generally acknowledged that this area of the First Amendment law is in flux and the United States Supreme Court cases offer very limited guidance." Pritzlaff v. Archdiocese of Milwaukee, 194 Wis.2d 302, 533 N.W.2d 780, 794 (1995) (Abrahamson, J., dissenting). See also Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441, 446-47 (Me.1997) (Lipez, J., dissenting) (explaining that this is "an area of the law in which the U.S. Supreme Court cases offer limited guidance and there remains significant doctrinal uncertainty").
[8] See supra note 2.
[9] See id.
[10] State courts: Louisiana: Roppolo v. Moore, 644 So.2d 206, 207 (La.Ct.App.1994) (holding that negligence claims against clergy member and religious organization for alleged sexual relationship during the course of a counseling relationship were tantamount to impermissible clergy malpractice claim); Maine: Bryan R. v. Watchtower Bible & Tract Soc'y, 738 A.2d 839, 848 (Me.1999) (stating in dicta that "[a]llowing a secular court or jury to determine whether a church and its clergy have sufficiently disciplined, sanctioned, or counseled a church member would insert the State into church matters in a fashion wholly forbidden by the Free Exercise Clause of the First Amendment"); Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441, 444 (Me.1997) (holding that First Amendment barred negligent supervision claim against a church regarding sexual relationship between adult parishioner and priest during the course of a marital counseling); Michigan: Teadt v. Lutheran Church Missouri Synod, 237 Mich. App. 567, 603 N.W.2d 816, 822-23 (1999) (holding that claim of breach of fiduciary duty against pastor for sexual relationship with parishioner during the course of pastoral counseling was tantamount to impermissible clergy malpractice claim); Minnesota: Mulinix v. Mulinix, No. C2-97-297, 1997 WL 585775, *6 (Minn.Ct.App. Sept.22, 1997) (holding that negligent retention and supervision claims based upon a pastor's sexual contact with parishioners was barred by the First Amendment); Missouri: Gibson v. Brewer, 952 S.W.2d 239, 246-48 (Mo.1997) (holding that First Amendment barred child victim of sexual abuse by priest from bringing negligent hiring and supervision claims, but that First Amendment would not be violated by adjudication of claim of intentional failure to supervise priest); H.R.B. v. J.L.G., 913 S.W.2d 92, 98-99 (Mo.Ct.App.1995) (holding that First Amendment barred child victim of sexual abuse by priest from bringing breach of fiduciary duty claim against priest, church official, and church); Nebraska: Schieffer v. Catholic Archdiocese of Omaha, 244 Neb. 715, 508 N.W.2d 907, 911-13 (1993) (holding that First Amendment barred adult parishioner who engaged in sexual relationship with priest during the course of pastoral counseling from bringing intentional infliction of emotional distress, negligence, and breach of fiduciary duty claims); Wisconsin: L.L.N. v. Clauder, 209 Wis.2d 674, 563 N.W.2d 434, 445 (1997) (holding that First Amendment barred consideration of negligent supervision claim against diocese for sexual relationship between adult parishioner and priest while the priest was counseling the parishioner in his position as a hospital chaplain); Pritzlaff v. Archdiocese of Milwaukee, 194 Wis.2d 302, 533 N.W.2d 780, 790 (1995) (same).

Federal courts: Dausch v. Rykse, 52 F.3d 1425, 1429 (7th Cir.1994) (holding that First Amendment barred parishioner's negligent hiring and supervision and breach of fiduciary duty claims against pastor and church for sexual contact that occurred between pastor and parishioner during the course of a counseling relationship); Ayon v. Gourley, 47 F.Supp.2d 1246, 1250 (D.Colo.1998) (holding that First Amendment barred negligent hiring and supervision claim against archdiocese for alleged sexual abuse of minor by priest), aff'd on other grounds 185 F.3d 873 (10th Cir.1999) (unpublished decision); Schmidt v. Bishop, 779 F.Supp. 321, 325-26 (S.D.N.Y.1991) (holding that First Amendment barred adult's breach of fiduciary duty claim against pastor for actions that occurred when parishioner was a minor).
[11] In Gibson v. Brewer, 952 S.W.2d 239 (Mo. 1997), the Missouri Supreme Court made a somewhat similar distinction between negligent conduct and the imposition of liability for an intentional tort. The court held that a claim for negligent supervision would result in excessive entanglement with religion and in the endorsement of one model of supervision. See id. at 247-48. However, in contrast, that court also decided that a claim for an intentional failure to supervise clergy would not offend the First Amendment because "[r]eligious conduct intended or certain to cause harm need not be tolerated under the First Amendment" just as "generally applicable criminal law" does not offend the First Amendment. Gibson, 952 S.W.2d at 248-49.
[12] Moreover, it is noteworthy that the common law of this State never embraced the charitable immunity doctrine, which arguably may have provided charitable institutions, including the Church Defendants in this case, immunity from respondeat superior liability for the tortious acts of their employees. See Community Blood Bank, Inc. v. Russell, 196 So.2d 115, 120-21 (Fla.1967) (Roberts, J., concurring specially) (citing Nicholson v. Good Samaritan Hosp., 145 Fla. 360, 199 So. 344 (1940)). As has been explained: "the public policy of this state, as declared by Section 4 of the Declaration of Rights of our Florida Constitution, `is to put justice "by due course of law" above or before charity.'" Russell, 196 So.2d at 121 (Roberts, J., concurring). Likewise, most jurisdictions have rejected this doctrine, recognizing that it is inappropriate that a charity should be held to a lesser standard of reasonable care than that required of any other person or entity. See generally John H. Arnold, Clergy Sexual Malpractice, 8 U. Fla. J.L. & Pub. Pol'y 25, 36 (1996).
[13] See Cutler v. St. John's United Methodist Church, 489 So.2d 123, 125 (Fla. 1st DCA 1986) (finding that church could be sued for negligent supervision of a seventeen-year old girl, who drowned at Jacksonville Beach during a church-sponsored trip to Florida); Heath v. First Baptist Church, 341 So.2d 265 (Fla. 2d DCA 1977) (ruling that church may be liable for slip and fall based on traditional premises liability theories); see also Laake v. Our Lady of Lourdes Church, Nos. 9-261, 98-959, 1999 WL 975751, at *4 (Iowa Ct.App. Oct.27, 1999) (holding that church had legal duty to prevent personal injuries sustained by referee during collision with spectator at church basketball game); Bass v. Aetna Ins. Co., 370 So.2d 511 (La.1979) (finding church responsible for negligence of pastor who created an unreasonable risk of injury by not clearing aisles to make way for the "running of the spirit," a common form of religious expression in that church); Stitt v. Holland Abundant Life Fellowship, 462 Mich. 591, 614 N.W.2d 88, 95 (2000) (holding that person attending bible study on church premises who injured herself after falling over a concrete tire stop in church parking lot was licensee for purposes of church's duty of care); Castronovo v. Doe, 274 A.D.2d 442, 711 N.Y.S.2d 27 (N.Y.App.Div.2000) (ruling that issues of fact precluded summary judgment for church when artist was injured after falling from scaffold).
[14] In Mallory, this Court adopted section 317 of the Restatement of Torts. Section 317 of the Restatement (Second) of Torts (1965), which is identical to its predecessor, provides:

Duty of Master to Control Conduct of Servant.
A master is under a duty to exercise reasonable care so to control his servant while acting outside the course of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in the possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control.
(Emphasis added.)
[15] The primary distinction between a claim for negligent hiring and a claim for negligent supervision or retention concerns the time at which the employer is charged with knowledge of the employee's unfitness. See Garcia v. Duffy, 492 So.2d 435, 438 (Fla. 2d DCA 1986). A claim for negligent hiring arises when, before the time the employee is hired, the employer knew or should have known that the employee was unfit. See id. Liability in these cases focuses on the adequacy of the employer's pre-employment investigation into the employee's background. See id. Liability for negligent supervision or retention, however, occurs after employment begins, where the employer knows or should know of an employee's unfitness and fails to take further action such as "investigating, discharge or reassignment." Id. at 438-39.
[16] Although the Colorado Supreme Court did not specify which of the religion clauses it was discussing, the court's inquiry appears to have focused on the Free Exercise Clause.
[17] See Miller v. Reed, 176 F.3d 1202, 1207 (9th Cir.1999) (applicant challenged denial of driver's license renewal because of applicant's refusal, on religious grounds, to supply his social security number); Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 363 (3d Cir.1999) (police officers challenged police department policy of requiring officers to shave their beards in violation of their Sunni Muslim religious beliefs); Vandiver v. Hardin County Bd. of Educ., 925 F.2d 927, 932 (6th Cir.1991) (challenge to requirement that student pass equivalency exam in order to gain credit for his religious home study program); Rector, Wardens, and Members of the Vestry of St. Bartholomew's Church v. City of New York, 914 F.2d 348, 354 (2d Cir.1990) (church challenge to Landmark Preservation Law as violative of Free Exercise Clause). Cf. City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (assuming that Smith would apply in the context of local zoning ordinances in the absence of the Religious Freedom Restoration Act).
[18] We have addressed only Counts I and II in this opinion. Counts VII and VIII of the complaint are assault and battery charges against Malicki. These counts remain pending in the trial court and are not before this Court. As to the claim for respondeat superior set forth in Counts III and IV, although not addressing the viability of the cause of action in this case, the Third District in a subsequent opinion has explained that

[a]s a matter of common sense, having sexual relations with a counselee is not part of the job responsibilities of a minister. Iglesia Cristiana La Casa Del Senor, Inc. v. L.M., 783 So.2d 353, 356-57 (Fla. 3d DCA 2001). Plainly the sexual conduct alleged by plaintiffs was for the personal motives of the pastor, and not designed to further the interests of the church.
See Elders v. United Methodist Church, 793 So.2d 1038, 1041 (Fla. 3d DCA 2001); see also Iglesia Cristiana La Casa Del Senor, 783 So.2d at 357 (explaining that vicarious liability was inapplicable where "the sexual assault did not occur on Church property, and the record does not support a finding that [the pastor's] criminal act against L.M. constituted the kind of conduct he was employed to perform, or that he was in any way motivated by his desire to serve the Church"). Further, with regard to Counts V and VI, we do not reach the issue of whether the allegations of the complaint set forth a cause of action for breach of implied contract because that question was neither reached by the trial court nor addressed by the Third District.
[19] We note that many of the decisions holding that the First Amendment bars tort claims based on similar allegations in a complaint arise at the motion to dismiss stage and appear to be grounded in theoretical speculation that an inquiry into a religious institution's conduct would result in excessive entanglement. See, e.g., Watchtower Bible, 738 A.2d at 845; Swanson, 692 A.2d at 444-45; Gibson, 952 S.W.2d at 246-47. In contrast, many courts that have actually adjudicated these claims, or have at least reached the summary judgment phase, have done so based on a concrete record revealing little, if any, doctrinal entanglement and certainly not excessive entanglement. See, e.g., Bear Valley Church, 928 P.2d at 1322-23; Konkle, 672 N.E.2d at 456; C.J.C., 985 P.2d at 262; Martinelli, 196 F.3d at 430-32.
[20] The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." See also art. I, § 3, Fla. Const.
[21] The majority's decision today is directly at odds with the recognition by our United States Supreme Court that the First Amendment provides churches with the "power to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine." Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (emphasis added).
[22] See the cases cited in the majority opinion at footnote 10.