346 So.2d 102 (1977)
MORRISON MOTOR COMPANY and Middlesex Mutual Fire Insurance Company, Appellants,
v.
MANHEIM SERVICES CORPORATION, a Foreign Corporation, et al., Appellees.
Nos. 76-830, 76-831.
District Court of Appeal of Florida, Second District.
May 18, 1977.
Rehearing Denied June 14, 1977.
*103 Charles P. Schropp, of Shackleford, Farrior, Stallings & Evans, Tampa, for appellants.
Thomas J. Ellwanger, of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, for appellees.
McNULTY, Judge.
Third-party plaintiffs/appellants seek indemnification over against appellees for monies paid out by appellants in a wrongful death action brought against appellant Morrison Motor Company as owner of the automobile which struck the decedents who were pedestrians at the time of the tragedy. The trial in the instant case centered around whether the driver of the automobile, one Bath, was an employee of appellee Manheim Services Corporation (d/b/a Lakeland Auto Auction) acting within the scope of his employment or was an independent contractor. Appellants urged he was an employee and that the Auto Auction, under respondeat superior, was liable as an active tortfeasor over to appellants who were passive. An alternative theory advanced below by appellants was that the auto auction had undertaken a nondelegable duty which rendered it liable in the premises even if the driver Bath were considered to be an independent contractor.
The trial judge directed a verdict in favor of the auto auction at the close of appellants' case in chief and this appeal ensued from the resulting judgment in favor of the auto auction. We affirm.
Considering the evidence in the light most favorable to appellants, as we must do in the present posture of the case, the following facts appear. Appellant Morrison Motor Company was in the used car business. Essentially, it purchased used cars from car rental agencies and, if it could not sell them with reasonable dispatch, would wholesale them through appellee Lakeland Auto Auction. Prior to the accident in this case, a practice had developed in the relationship between the parties hereto by which, when Morrison Motor Company wished to have certain cars transported to the auction for sale at an early time so as to get "early numbers" (meaning that the cars could be sold early on the day of the auction when prices were higher), an agent of Morrison Motors would call the general manager of the auto auction, Rudy Crowder, a day or so in advance of the auction requesting that he arrange to have the cars picked up and transported timely to the auction. During this time period, a Carol Buchanan was employed three days a week by the auto auction as a registration clerk whose duties involved writing up bills of sale for the various automobiles handled by the auto auction and numbering the cars for identification at the sale. Additionally, with the acquiescence of Crowder, she would occasionally transport and arrange for others to *104 transport to the auction the cars of three of the best customers or clients of the auction, one of which was Morrison Motor. The evidence is undisputed that on virtually every occasion on which she transported or arranged to transport cars for these clients, she did so on her own time after she had clocked out of her employment with the auto auction (if it were one of her working days) and with the clear understanding with her boss, Rudy Crowder, that she was strictly "on her own" and that the auto auction was undertaking no responsibility. It further appears that each of the aforementioned three clients, including Morrison Motor Company knew and was aware of this arrangement. Indeed, the testimony of J. Forrest Morrison, President of Morrison Motors (whose testimony was introduced by deposition, he having died shortly before trial), revealed that he never paid the auction for such transportation of his cars, that he paid Ms. Buchanan or other drivers directly for driving the cars, that he paid the auto auction otherwise for fees or charges payable for the latter's services in the sale of his cars, and that he really didn't know precisely what arrangements or relationship existed between the auto auction and the drivers. He would merely call the auction "for the services they had available" thinking, it appears, it had some arrangement with a car-driving service.
On the day of the accident, November 15, 1971, Morrison had some cars he wanted transported to the auction for sale at the next ensuing auction. Following his usual custom, he called the auto auction and talked to Crowder about arranging for transporting the cars to the auction. Crowder answered, "I'll take care of it." Later on the day, Carol Buchanan, who was then working one of her appointed days at the auction, received a call at the auction from another employee of Morrison Motors, one Domingues, who asked her to pick up a certain number of cars. Since the purpose of the transportation was to "get early numbers," and since Ms. Buchanan's duties involved numbering cars for identification at the sale, she then informed Mr. Crowder that she was going to pick up the Morrison cars and got his permission to reserve "early numbers."
That evening, after Ms. Buchanan had clocked out from her job at the auto auction at 5:00 p.m., and pursuant to her usual custom on these occasions, she contacted some people to ask if they would be interested in earning some extra money by assisting her in transporting the Morrison cars to the auction. One of these people contacted was the driver of the car involved in the fatal accident, Bath, who himself was employed full time by the auto auction as a janitor and who had also clocked out from his duties at the auction. Ms. Buchanan on prior occasions had gotten Bath to assist her to pick up cars, apparently with Rudy Crowder's knowledge and acquiescence, but on no occasion had he ever picked up cars while on the auto auction time or at the direction or request of Crowder. Obviously, on this occasion, he agreed to accompany Ms. Buchanan in the transportation of Morrison's cars and the tragic sequence of events began.
We agree with the trial judge that under the foregoing set of facts, neither Ms. Buchanan nor Bath, at the time of the accident, were employees of the auto auction acting within the scope of their employment therefor. An employee's conduct is within the scope of his employment only if it is of the kind he is employed to perform, it occurs substantially within the time and space limits of the employment and it is activated at least in part by a purpose to serve the master.[1] The convenient test is whether the employee was doing what his employment contemplated.[2] Clearly, here, both Buchanan and Bath were on their own, "moonlighting," and no version of the foregoing facts would support a finding that they were not.
As to appellants' alternative theory that the auto auction undertook a non-delegable *105 contractual duty to transport Morrison's cars, they point to Rudy Crowder's aforequoted response  "I'll take care of it."  as evidence of the undertaking and they rely on the case of Mills v. Krauss[3] for the proposition that given such an undertaking the auto auction cannot avoid liability by delegating its duties to an independent contractor. Their contention falls of its own weight, however, because even if Crowder's response was sufficient to give rise to a non-delegable contractual duty in this case, the duty assumed was to transport Morrison's cars, which wasn't the duty breached. The duty breached here was one owing to the third-party victims, not Morrison; and as to them the general rule of non-liability of an employer for the negligence of an independent contractor applies. Mills v. Krauss, supra, makes this distinction clear and holds precisely that. Appellants' reliance on Mills, therefore, is misplaced. Stated otherwise, Morrison's position as against the auction for damages payable to the victims of the accident in this case ought be no better than the victims'.
In view whereof, the order appealed from should be, and it is hereby, affirmed.
BOARDMAN, C.J., and OTT, J., concur.
NOTES
[1] See Whetzel v. Metropolitan Life Insurance Company, 266 So.2d 89 (Fla.4th DCA 1972).
[2] Weiss v. Jacobson, 62 So.2d 904 (Fla. 1953).
[3] 114 So.2d 817 (Fla.2d DCA 1959).