783 So.2d 353 (2001)
IGLESIA CRISTIANA La CASA Del SEÑOR, INC., etc., Appellant,
v.
L.M., etc., Appellee.
No. 3D99-1712.
District Court of Appeal of Florida, Third District.
May 2, 2001.
*354 Dittmar & Hauser and Helen Ann Hauser, Coconut Grove, for appellant.
Gallwey Gillman Curtis Vento & Horn and Karen H. Curtis, Miami; Verploeg & Lumpkin and Michelle M. Niemeyer, for appellee.
Before SCHWARTZ, C.J., and GODERICH and SORONDO, JJ.
PER CURIAM.
Iglesia Cristiana La Casa Del Senor, Inc. (the Church), one of the defendants below,[1] appeals from the trial court's final judgment in favor of L.M.,[2] the plaintiff.

I. Factual Background
L.M. sued Ali Pacheco, the former pastor of the Church, as well as the Southeastern Spanish District Council of the Assemblies of God (District), the General Council of the Assemblies of God (Council), and the Church, alleging that Pacheco had sexually assaulted her in July 1991 when she was a minor.[3] The allegation of sexual assault formed the basis of L.M.'s claims against the Church based on negligent supervision and respondeat superior.
During the pendency of the litigation, the Church corporation dissolved.[4] The *355 District and the Council settled with L.M. and were dismissed from the action by stipulation. The case proceeded to a jury trial against the Church and Pacheco.
The evidence at trial established that at the time the criminal act occurred, L.M. was sixteen years old. Her parents were very protective of her and forbade her to be alone with boys. L.M. spent most of her time attending services and volunteering at the Church, where defendant Pacheco served as pastor from January 1990 to July 1991. Pacheco and his wife, Raquel, were president and vice-president of the corporation, respectively, and both served on the Board of Directors. The Pacheco family and L.M.'s family became friends and would see each other socially.
In May and June of 1991, L.M. received gifts of perfume and flowers with cards signed by a secret admirer. L.M. and her parents testified that they did not know the identity of the secret admirer, although they suspected one of the boys from the Church. They attempted to find out the source of the gifts by inviting the boys out to eat and comparing their handwriting to the one on the cards that L.M. had been receiving. None of the handwriting samples matched, however. Ultimately, L.M. and her mother learned the secret admirer's identity through Raquel Pacheco. L.M.'s mother testified that Mrs. Pacheco advised her that Pacheco was the person who had sent the gifts. She did not specify when Mrs. Pacheco had disclosed this information; her testimony only indicated that she was told before she learned of the sexual assault.
The evidence also revealed that before the criminal act took place, Pacheco visited L.M.'s residence twice when L.M. had been left home alone. L.M.'s parents happened to see him on these occasions but did not suspect Pacheco of any wrongdoing. On another occasion, Pacheco visited L.M. at her school; he justified his presence by stating that he was considering enrolling his daughters there. L.M. told her mother about Pacheco's visit, but did not advise anyone from the Church.
According to L.M., on July 8, 1991,[5] Pacheco called her at work and invited her to lunch to discuss her parents' marital problems. L.M. accepted, and Pacheco picked her up from work between noon and 1:00 p.m. L.M. noticed a sandwich and soft drink in the car. Pacheco drove to a Marriott Hotel. L.M. testified that Pacheco led her to a room he had rented, and told her not to worry because she would finally be cured.[6] He then proceeded to sexually assault her.
Pacheco testified that L.M. consented to having sex. He denied having invited L.M. to lunch to discuss her parents' marital problems. According to him, their meeting was prearranged. They had discussed the matter and had in fact been to the Marriot Hotel on the previous day intending to have sexual relations, but had decided against it. Pacheco testified that he knew what he was doing was wrong, but explained that it was a great temptation *356 in his life. He denied telling L.M. that she would be cured, and admitted that he had an adulterous affair in Venezuela before becoming a minister.
Among the witnesses presented by the Church were Carlos De La Fe, Eduardo Rodriguez, George Wood, and Inerio Murillo, all of whom appeared by way of deposition testimony. Eduardo Rodriguez, a member of the General Presbyter, explained the process that Pacheco had to undergo to become a minister at the Church. According to Rodriguez, the District is responsible for investigating and approving candidates. Rodriguez's testimony established that the District did not wish for the Church to conduct its own independent investigation.
Carlos De La Fe, the Church's deacon, corroborated Rodriguez's testimony. He testified that the Church did not conduct background checks of potential pastors; that task was left to the District. Furthermore, De La Fe testified that prior to Pacheco becoming a pastor at the Church, he was unaware of anything in Pacheco's background that would have prevented him from becoming a pastor.
The General Secretary for the Council, George Wood, testified that the Council had the right to approve ordination of any minister within the organization. Licensing was delegated to the District.
Inerio de Jesus Murillo, a pastor and the president of the National Federation of Assemblies of God, testified that he had known Pacheco for about eighteen years. They met in Caracas, Venezuela, where Pacheco worked as an evangelist. Murillo testified that he was not aware of any problems with Pacheco's background up to that time. Before the crime against L.M., Murillo had no knowledge that Pacheco had been involved in an adulterous relationship.
The trial court denied the Church's motions for directed verdict.
The jury returned a verdict in L.M.'s favor, finding the Church liable for Pacheco's criminal act on the grounds of respondeat superior and negligent supervision. The lower court denied the Church's motion for judgment notwithstanding the verdict and to set aside the verdict and any judgment entered thereon, and entered a final judgment in accordance with the jury's verdict.

II. Analysis
The Church contends that its motions for directed verdict or judgment notwithstanding the verdict on the theories of respondeat superior and negligent supervision should have been granted. We agree.[7]

A. Respondeat Superior
Under the doctrine of respondeat superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer. Nazareth v. Herndon Ambulance Serv., Inc., 467 So.2d 1076, 1078 (Fla. 5th DCA 1985); see Perez v. Zazo, 498 So.2d 463, 465 (Fla. 3d DCA 1986)("It is entirely clear that responsibility for the intentional wrongful acts of a servant-employee may be visited upon his master-employer under the doctrine of respondeat superior only when that conduct in some way furthers the interests of the master or is at least *357 motivated by a purpose to serve those interests, rather than the employee's own.")(footnote omitted). An employee's conduct is within the scope of his employment, where (1) the conduct is of the kind he was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master. Sussman v. Florida E. Coast Props., Inc., 557 So.2d 74, 75-76 (Fla. 3d DCA 1990). "Generally, sexual assaults and batteries by employees are held to be outside the scope of an employee's employment, and therefore, insufficient to impose vicarious liability on the employer." Nazareth, 467 So.2d at 1078. An exception may exist where the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship. Id.; compare Hennagan v. Department of High. Saf. & Motor Veh., 467 So.2d 748 (Fla. 1st DCA 1985), with Agriturf Mgmt., Inc. v. Roe, 656 So.2d 954 (Fla. 2d DCA 1995).
The court in Hennagan was asked to determine whether the allegations in the complaint, which alleged that a trooper had lured a minor into his car and molested her under the pretext that she was a shoplifting suspect, were sufficient to survive a motion to dismiss. 467 So.2d at 749. The court found that the allegations were sufficient, holding that it could not be said, as a matter of law, that the acts alleged were or were not done in furtherance of the trooper's duties to apprehend a shoplifting suspect. Id. at 751. While the trooper's acts resulted in a criminal offense, the court noted that such a result did not preclude a determination that the acts were initiated in the course and scope of the trooper's employment and to serve the interests of the employer.[8]Id.
In Agriturf, the Second District Court of Appeal distinguished Hennagan, noting that unlike the defendant in that case, the company president's sexual abuse of a minor did not have as its source or purpose any intent to serve the employer. 656 So.2d at 955. In that case, the company president's six-year old granddaughter would often accompany him to work and help him clean and put away equipment. Id. On several of these occasions, the company president sexually abused the child. Id. The court reversed the trial court's verdict finding the employer company, a landscaping business, vicariously liable for the company president's illegal acts. Id. at 956. The court found that although the acts of cleaning and putting away equipment occurred within the president's course and scope of employment, the sexual abuse did not. Id. at 955. As a matter of law, the court held, the president's fondling of his six-year old granddaughter did not occur in furtherance of the company's business objectives. Id. The court noted that if any relationship aided the president's deviant purpose, it was the familial relationship he shared with his victim. Id.
In this case, the sexual assault did not occur on Church property, and the record does not support a finding that Pacheco's criminal act against L.M. constituted the kind of conduct he was employed to perform, or that he was in any way motivated by his desire to serve the Church. See, e.g., N.H. v. Presbyterian Church (U.S.A.), 998 P.2d 592, 599 (Okla.1999)(holding that minister's deviant sexual conduct with children was not within his scope of employment or in furtherance of national organization's business: "Ministers should not molest children. *358 When they do, it is not a part of the minister's duty nor customary within the business of the congregation. Rather than increasing membership, the conduct would assuredly result in persons spurning rather than accepting a faith condoning the abhorrent behavior.")(footnote omitted); Doe v. Hartford Roman Catholic Diocesan Corp., 45 Conn.Supp. 388, 716 A.2d 960, 964 (1998)(finding that case involving minor sexually abused by priest who was supposed to be counseling her represents "exceptional case," where the employee's act was clearly a digression from duty and beyond the scope of employment). On the contrary, the record establishes that Pacheco's purpose in arranging the meeting that day was to satisfy his personal interests, not to further the Church's objectives. Regardless of the stated reason for the meeting between Pacheco and L.M., it is undisputed that no counseling occurred on the day of the crime. While Pacheco may have had access to L.M. because of his position as the Church pastor, whom L.M. and her family had become friends with over time, he was not engaging in authorized acts or serving the interests of the Church during the time he tried to seduce her or on the day he raped her. See Konkle v. Henson, 672 N.E.2d 450, 457 (Ind.Ct.App.1996). The sexual assault was an independent, self-serving act by Pacheco; an act that he knew was wrong to commit and that the Church would surely have tried to prevent had it known of his plans.
We agree with the Church that Pacheco's sexual assault of L.M. did not occur within the scope of his employment. Accordingly, we find, as a matter of law, that the Church cannot be held vicariously liable for Pacheco's criminal act.

B. Negligent Supervision
For the Church to be held liable for negligent supervision, it must have had constructive or actual notice that Pacheco was unfit to work as a pastor at the Church. See M.V. v. Gulf Ridge Council Boy Scouts of Am., Inc., 529 So.2d 1248 (Fla. 2d DCA 1988).
Essentially, L.M. contends that the Church was negligent in failing to supervise Pacheco, when it knew or should have known of the problem of sexual abuse by religious leaders and of Pacheco's own past sexual misconduct. In this regard, she argues that the Church failed to discover Pacheco's extramarital affair with a consenting adult, which, if known, may have led the Church to take reasonable measures to prevent the risk of harm that Pacheco posed to its members.
The record does not support L.M.'s contention. There was insufficient evidence at trial to show that the Church had reasonable notice that sexual abuse by religious leaders was a prevalent problem, such that it should have supervised its staff more closely to prevent reasonably foreseeable harm.
As to the Church's knowledge of Pacheco's background, the evidence showed that the Church was not empowered to investigate Pacheco or any other potential applicant. The District carried that burden. Their investigation of Pacheco did not reveal his extra-marital affair with a consenting adult. The only Church official who knew of the affair, aside from Pacheco,[9] was Raquel Pacheco who found *359 out approximately one year before the crime against L.M.
L.M. contends that Mrs. Pacheco's knowledge of her husband's adulterous affair, coupled with her knowledge before the crime that he was the person who had been sending gifts to L.M., should have placed the Church on notice and prompted it to take preventive measures. This argument, however, is not supported by the record. L.M.'s mother testified that Mrs. Pacheco revealed the identity of the secret admirer to her before telling her about the criminal act. She did not specify when. Pacheco testified that he confessed everything to his wife before anyone else had told her about the crime. There is simply insufficient evidence to establish that Mrs. Pacheco knew the identity of the secret admirer before the criminal act occurred. However, even if the Church had learned of Pacheco's affair with a consenting adult and of his gifts to L.M., it is illogical to conclude that it should have anticipated that a seemingly normal and non-violent Pacheco would abuse his position as pastor to rape a minor.[10]
We find no basis in the record to hold the Church liable for Pacheco's criminal act under either respondeat superior or negligent supervision.[11] Therefore, we reverse the trial court's final judgment and remand with instructions to enter judgment in favor of Appellant.
Reversed and remanded with instructions.
NOTES
[1] Ali Pacheco, the other defendant found liable, is not a party to this appeal.
[2] Although plaintiff/appellee is now an adult, because of the delicate nature of the facts in this case we will refer to her by her initials only.
[3] The action was initially brought by L.M.'s parents on her behalf; once L.M. reached the age of majority, she replaced her parents in the suit.
[4] When the corporation dissolved, L.M. filed a Fifth Amended Complaint, which substituted the last three directors and trustees of the Church corporation, Daniel Leoni, Carlos De La Fe, Sr., and William Jaramillo, as party defendants.
[5] Throughout the litigation L.M. maintained that the sexual assault occurred on July 8, 1991. Pacheco did not object to this date until mid-trial, when he was confronted with an inconsistency in his testimony.
[6] L.M. suffered from fainting spells. Prior to the sexual assault, she had confided in Raquel Pacheco that as a child her brother had played doctor with her. According to L.M., sometime thereafter, Pacheco told her that God had revealed to him that she had been sexually molested. He indicated that was the source of her fainting spells and that she needed to be cured.
[7] This appeal does not raise any First Amendment issues. Our review and analysis of the Church's liability under respondeat superior and negligent supervision disposes of the remaining issues and arguments raised on appeal by the Church and L.M., as cross-appellant.
[8] The court recognized, however, that on the more stringent test of summary judgment or trial, the matters might be resolved adversely to the plaintiff. Hennagan, 467 So.2d at 751.
[9] Although Pacheco was a director and president of the corporation, his knowledge of his own adulterous affair cannot be imputed to the corporation because the act was committed outside the scope of his employment. Davies v. Owens-Illinois, Inc., 632 So.2d 1065, 1066 (Fla. 3d DCA 1994); Agriturf, 656 So.2d at 955. To say otherwise would, in effect, turn the employer into the insurer of its employees' independent, illegal actions. Agriturf, 656 So.2d at 955.
[10] The testimony at trial showed that Pacheco was a renowned evangelist whose work earned him recommendations to become the Church pastor. All of those who knew Pacheco or who investigated him indicated that he had a normal background. There was no evidence presented that his deviant conduct was or could have been expected or foreseen by the Church.
[11] We note that our decision is supported by other jurisdictions that have dealt with similar facts and issues. See, e.g., Rita M. v. Roman Catholic Archbishop of Los Angeles, 187 Cal.App.3d 1453, 232 Cal.Rptr. 685 (1986); Doe v. Hartford Roman Catholic Diocesan Corp., 45 Conn.Supp. 388, 716 A.2d 960; Konkle v. Henson, 672 N.E.2d 450; N.H. v. Presbyterian Church (U.S.A.), 998 P.2d 592.