[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

————————————————

No. 21-13468

————————————————

JONATHAN MULLANE,

Plaintiff-Appellant,

*versus*

FREDERICO A. MORENO,
DOES 1 through 10,
Inclusively, in their individual and official capacities,
UNITED STATES OF AMERICA,

Defendants-Appellees,

ALISON W. LEHR, et al.,
Inclusively, in their individual and official capacities,

Defendants.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-21339-AKK

————————————————

Before JORDAN and BRASHER, Circuit Judges, and GERAGHTY,* District Judge.

GERAGHTY, District Judge:

This case concerns an internship gone awry.  Plaintiff Jonathan Mullane, a law student at the University of Miami, interned at the United States Attorney's Office (USAO) for the Southern District of Florida.  In Mullane's telling, his USAO supervisor, frustrated by Mullane's airing of workplace grievances, unlawfully conspired with the United States Attorney and a federal judge to terminate Mullane's internship and to spread defamatory statements about him to media outlets.  This lawsuit followed.  It presents the question of whether a federal prosecutor's alleged acts fall within the scope of her employment and thus afford her absolute immunity from common-law tort claims under the Westfall Act.  We also consider whether a federal judge's act of reporting Mullane's alleged misconduct to his law school is entitled to judicial immunity.[1]

## I.

### A.

In 1988, the Supreme Court decided *Westfall v. Erwin*, 484 U.S. 292 (1988), holding that absolute immunity from state-law tort actions shielded federal employees when their conduct was both

---

* Honorable Sarah E. Geraghty, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] As to any issues not discussed, we summarily affirm.

"within the scope of their official duties *and* . . . discretionary in nature." *Id.* at 297-98. The *Westfall* Court also invited Congress to legislate the contours of federal employee immunity because it was "in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity is warranted in a particular context." *Id.* at 299-300.

Congress' answer was the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the "Westfall Act." The Westfall Act amended the Federal Tort Claims Act (FTCA) by making an FTCA suit against the United States the exclusive remedy for damages "arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 2679(b)(1). In so doing, Congress removed the discretionary function requirement, granting "federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007).

The Westfall Act specifies the procedural mechanism for invoking its protection. "When a federal employee is sued for wrongful or negligent conduct, the Act empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'" *Id.* at 229-30 (quoting 28 U.S.C. § 2679(d)(1), (2)). Upon certification, the suit is "deemed an action against the United

States" under the FTCA and the United States is substituted as the party defendant.  28 U.S.C. § 2679(d)(1).

The Attorney General's certification, however, is subject to judicial review. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995); *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1305 (11th Cir. 2022).  It serves as *prima facie* evidence that the conduct at issue occurred within the scope of employment, *Omnipol*, 32 F.4th at 1305, and the burden of proving that an employee acted outside the scope of employment is on the plaintiff.  *Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir. 1996).  If a plaintiff successfully challenges the Attorney General's certification, the employee is resubstituted as the defendant in the action.  *Lamagno*, 515 U.S. at 434-35.

The determination of whether an employee's actions fall within the scope of his employment is "governed by the law of the state where the incident occurred."  *Omnipol*, 32 F.4th at 1305 (quoting *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1542 (11th Cir. 1990)).  "The test for scope of employment is an objective one, based on all the facts and circumstances."  *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (cleaned up).  Because such a determination poses a mixed question of law and fact, the district court reviews the Attorney General's certification *de novo*.  *Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992).

### B.

In early 2018, Jonathan Mullane, a second-year law student at the University of Miami, interned at the U.S. Attorney's Office

(USAO) for the Southern District of Florida. During the same period, Mullane filed a civil action, acting *pro se*, against Barclays Bank (Barclays) in Florida state court. On February 15, 2018, Barclays removed the case to the U.S. District Court for the Southern District of Florida. *See Mullane v. Barclays Bank Delaware, Inc.*, Civ. Action No. 1:18-cv-20596-RNS (S.D. Fla.). The case was assigned to Judge Federico A. Moreno. Thus, as Mullane was interning at the USAO, his lawsuit was proceeding before a judge located in the same district.

Mullane alleges that his supervisor at the USAO, Assistant U.S. Attorney (AUSA) Alison Lehr, engaged in misconduct by assigning him to work on an asset forfeiture case. The forfeiture case sought the seizure of assets from a purported money laundering scheme involving a Venezuelan state-owned oil company. By happenstance, Mullane's father, a criminal defense attorney, served as lead counsel to an alleged co-conspirator in the scheme and Mullane had previously assisted his father by translating confidential documents in the case. According to Mullane, he disclosed these potential conflicts of interests to AUSA Lehr, but she tasked him with the asset forfeiture case anyway.

Later, in an alleged bid to hide this misconduct, Lehr and her boss, acting U.S. Attorney Benjamin Greenberg, purportedly attempted to "quietly" terminate Mullane. Mullane asserts that when he refused to leave voluntarily, Lehr and Greenberg enlisted Judge Moreno, who was presiding over Mullane's civil action against Barclays, to falsely accuse Mullane of misconduct in court.

These allegations of misconduct would, in Mullane's words, provide the "pretext" and "good cause" for his firing.

In April 2018, Judge Moreno scheduled a hearing in Mullane's civil case. At the hearing, Judge Moreno questioned Mullane about Mullane's prior visit to his chambers and an *ex parte* conversation that Mullane initiated with Judge Moreno's law clerk regarding the lawsuit. In particular, Judge Moreno expressed concern that Mullane identified himself as working for the USAO when approaching the law clerk with an inquiry about a personal civil matter. Protesting that characterization, Mullane argued that he only represented himself as a USAO intern because Judge Moreno's clerk asked where he worked. Judge Moreno expressed doubt about Mullane's candor during the hearing and again when ruling on Mullane's subsequent motion for his recusal. In granting Mullane's motion for recusal, Judge Moreno "reserve[d] the right upon further investigation to refer the matter to . . . the University of Miami School of Law." Specifically, Judge Moreno stated he would seek the courthouse's security footage to confirm the accuracy of Mullane's claim that he was dressed in beach attire on the day he accessed Judge Moreno's chambers. Judge Moreno ultimately sent a letter to the University of Miami School of Law explaining his concerns about Mullane and attaching documents from the civil case as well as a *Law360* article about the incident.[2] In the suit

---

[2] The court may consider documents attached to Mullane's complaint as exhibits in resolving a motion to dismiss without converting the motion to one for summary judgment. *See Saunders v. Duke,* 766 F.3d 1262, 1270 (11th Cir. 2014) (stating that documents attached to a complaint can generally be

before us, Mullane contends that Judge Moreno's "false allegations" of misconduct were intended "to assist Defendants Greenberg and Lehr by providing them with a spurious excuse" to terminate his employment.

According to Mullane, following the hearing, AUSA Lehr forwarded, from her personal email address, a copy of the hearing transcript and related documents to *Law360*, a legal publication, and *Above the Law*, a website covering legal issues. Lehr also submitted a negative and allegedly defamatory employment evaluation to Mullane's law school, which referred to the hearing before Judge Moreno. Per Mullane, the defamatory statements contained in the documents Lehr forwarded were "republished" in national legal publications. As a result, Mullane suffered reputational harm and was "forced to withdraw" from his law school.

The consequences for Mullane did not end there. Mullane claims that Lisa Roberts, a lawyer at the SEC, had promised him full-time employment following his completion of law school. But after the incidents described above, Roberts allegedly joined Lehr, Greenberg, and Judge Moreno's unlawful scheme to retaliate against Mullane. Specifically, Mullane asserts, Roberts prompted

---

considered by a court in ruling on a motion to dismiss); *Taylor v. Appleton*, 30 F.3d 1365, 1367 n.3 (11th Cir. 1994) (concluding that an exhibit attached to the complaint was "part of the pleadings," and thus could be relied upon by the district court without converting the defendant's motion to dismiss into one for summary judgment).

the SEC to withdraw its offer of employment and falsely represented that he had failed his SEC background check.

## C.

Mullane brought this suit asserting nineteen claims against Judge Moreno, Lehr, Greenberg, and Roberts, including several common-law tort claims sounding in defamation, tortious interference, intentional infliction of emotional distress, fraud, invasion of privacy, and breach of fiduciary duty. Defendants moved to dismiss Mullane's claims on various grounds. Simultaneously, the Attorney General moved, pursuant to the Westfall Act, to substitute the United States as the party defendant for Mullane's claims asserted against Lehr, Greenberg, and Roberts. The Attorney General certified that Lehr, Greenberg, and Roberts were acting within the scope of their federal employment during the incidents alleged in Mullane's complaint.

In addition to contesting Defendants' arguments for dismissal, Mullane challenged the Westfall Act certification, contending that Defendants' alleged misconduct fell outside the scope of their employment. Alternatively, he requested limited discovery to probe the sufficiency of the Attorney General's scope-of-employment certification.

The district court, applying Florida law, held that Defendants' actions were within the scope of their federal employment. Accordingly, the court substituted the United States as the party defendant for the state-law tort claims asserted against Lehr, Greenberg, and Roberts. The remainder of Mullane's claims were

dismissed on several grounds, including that Judge Moreno was entitled to absolute judicial immunity.

Mullane appeals the district court's dismissal of his claims and its substitution of the United States as defendant pursuant to the Westfall Act. We affirm the district court's thorough and well-reasoned forty-four-page decision, except as to its analysis of whether AUSA Lehr acted within the scope of her employment during certain incidents alleged by Mullane.

## II.

We review *de novo* a district court's dismissal for failure to state a claim, accepting all alleged facts as true and construing them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). We also review our jurisdiction *de novo*. *Allen v. AT&T Mobility Servs.*, 104 F.4th 212, 215 (11th Cir. 2024).

## III.

Following the substitution of the United States for Lehr, Greenberg, and Roberts, on July 30, 2021, Mullane voluntarily dismissed, without prejudice, all his claims against the United States pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). This appeal followed. Because "how a party drops a claim or a defendant can trigger appellate jurisdictional issues[,]" we are obligated, as an initial matter, to ensure that we have jurisdiction. *Baxter v. Santiago-Miranda*, 121 F.4th 873, 883 (11th Cir. 2024).

Aside from a few narrow exceptions inapplicable here, our jurisdiction is confined to "final decisions of the district courts." 28 U.S.C. § 1291. "A final decision is typically one that ends the litigation on the merits and leaves nothing for the court to do but execute its judgment." *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 986 (11th Cir. 2022) (quoting *Mayer v. Wall St. Equity Grp., Inc.*, 672 F.3d 1222, 1224 (11th Cir. 2012)). Generally, "an order adjudicating fewer than all the claims in a suit, or adjudicating the rights and liabilities of fewer than all the parties, is not a final judgment from which an appeal may be taken." *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007).

Pursuant to Rule 41(a)(1), a plaintiff "may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment[.]" Fed. R. Civ. P. 41(a)(1)(A)(i). "Rule 41(a)'s reference to the voluntary dismissal of 'an action' refers to 'the whole case' instead of particular claims." *Esteva v. UBS Fin. Servs. Inc.*, 60 F.4th 664, 675 (11th Cir. 2023). This Court recently confirmed that, "in a multi-defendant lawsuit, an 'action' can refer to all the claims against one party." *Baxter*, 121 F.4th at 884 (quoting *Rosell v. VMSB*, 67 F.4th 1141, 1144 n.2 (11th Cir. 2023)).

Here, in granting Defendants' motion to dismiss, the district court dismissed Mullane's claims against all Defendants other than the United States. Mullane later voluntarily dismissed *all* claims— the "action"—against the United States, the sole remaining defendant in the case. As such, Mullane's voluntary dismissal was valid

under Rule 41(a)(1) and left no claims pending in the district court. *See Baxter*, 121 F.4th at 884.  We therefore have jurisdiction to consider his appeal.[3]

## IV.

We now turn to Mullane's challenge of the district court's determination that Lehr, Greenberg, and Robert's actions fall within the scope of their federal employment.  That inquiry is governed by the *respondeat superior* law of the state where the allegedly

---

[3] This Court has sometimes held, pursuant to the "*Ryan* rule," that voluntary dismissals without prejudice are not final, appealable judgments.  *See Ryan v. Occidental Petroleum Corp.*, 577 F.2d 298, 303 (5th Cir. 1978).  "The purpose of this rule is to prevent a party from voluntarily dismissing its remaining claims without prejudice after a non-final adverse district court order has been entered in order to manufacture a final judgment."  *Equity Inv. Partners, LP v. Lenz*, 594 F.3d 1338, 1341 n.2 (11th Cir. 2010).  Several decisions since *Ryan* have cast doubt on its core holding.  *See Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1231 (11th Cir. 2020) (holding "that an order granting a motion to voluntarily dismiss the remainder of a complaint under Rule 41(a)(2) qualifies as a final judgment for purposes of appeal" (cleaned up)); *Lenz*, 594 F.3d at 1341 n.2 (declining to follow *Ryan's* rule because there was no indication that the parties had attempted "to manufacture a final judgment to pursue an immediate appeal"); *State Treasurer of State of Michigan v. Barry*, 168 F.3d 8, 18 (11th Cir. 1999) (Cox, J., concurring) (arguing that *Ryan* was wrongly decided).  We decline to apply the *Ryan* rule here because there is no indication that Mullane attempted to manufacture jurisdiction by voluntarily dismissing his claims against the United States.  Instead, he likely recognized the inevitable: He was precluded from pursuing his state-law tort claims against the United States by the "intentional tort exception" to the FTCA's waiver of sovereign immunity.  *See* 28 U.S.C. § 2680(h); *see generally Levin v. United States*, 568 U.S. 503, 507 (2013) (referring to 28 U.S.C. § 2680(h) as the "intentional tort exception").

unlawful acts occurred.  *Omnipol*, 32 F.4th at 1305 (quoting *S.J. & W. Ranch*, 913 F.2d at 1542).  Under Florida law, which mirrors the RESTATEMENT (SECOND) OF AGENCY (1958), an employee's conduct is within the scope of his employment if "(1) the conduct is of the kind he was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master."  *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 357 (Fla. Dist. Ct. App. 2001); *see McGhee v. Volusia Cnty.*, 679 So. 2d 729, 732 (Fla. 1996).  "Stated another way, the issue is 'whether the employee was doing what his employment contemplated.'"  *Nadler*, 951 F.2d at 305 (quoting *Morrison Motor Co. v. Manheim Servs. Corp.*, 346 So.2d 102, 104 (Fla. Dist. Ct. App. 1977)).  An employee's intentional torts fall within the scope of employment "where the employee's tortious conduct is undertaken in furtherance of the employer's interests."  *Grippa v. Rubin*, 133 F.4th 1186, 1200 (11th Cir. 2025) (quoting *Fields v. Devereux Found., Inc.*, 244 So. 3d 1193, 1196 (Fla. 2d Dist. Ct. App. 2018)).

As our precedents suggest, the scope-of-employment inquiry proceeds on an *act-by-act* basis.  *See Nadler*, 951 F.2d at 305-06 (determining that most of an AUSA's actions were within the scope of employment, but that one action—leaking a criminal investigation to the press—was not); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996) ("The question of whether *a given act* falls within the scope of employment is highly fact-specific[.]" (emphasis added)).  Our approach in this regard is consistent with the text of the Westfall Act, which attaches immunity to a federal

employee's "wrongful act or omission" or an "incident out of which the [plaintiff's] claim arose[.]" 28 U.S.C. §§ 2679(b)(1), (d)(1), (d)(2). Thus, in a multi-act or multi-incident case where the Attorney General's certification is challenged, a district court should evaluate whether each separate "act" or "incident" falls within the scope of the defendant's federal employment. *See Lyons v. Brown*, 158 F.3d 605, 608-09 (1st Cir. 1998) (concluding that the Westfall Act's scope-of-employment determination does not call for an "all or nothing judgment" and must be analyzed at the level of individual "acts or incidents"); *Jamison v. Wiley*, 14 F.3d 222, 236-37 (4th Cir. 1994) (reviewing the district court's Westfall Act findings on the scope-of-employment issue on an act-by-act basis); *Arbour v. Jenkins*, 903 F.2d 416, 422 (6th Cir. 1990) (observing that most of the acts alleged in a suit against several postal workers likely fell within their scope of employment, but that at least one, locking someone in a maintenance garage, might not); *Bowles v. United States*, 685 F. App'x 21, 25-26 (2d Cir. 2017) (finding that Westfall Act certification was appropriate as to some allegedly defamatory statements, but not others).

In this case, the district court reviewed the Attorney General's certification under the proper *de novo* standard of review. *Omnipol*, 32 F.4th at 1306. Accepting the allegations in Mullane's complaint as true, the district court examined certain acts that Defendants were alleged to have taken and concluded they fell within the scope of their employment under Florida law. Beginning with Lehr, the court found that her submission of an allegedly defamatory performance review was part of her responsibilities as

Mullane's supervisor, and served, at least in part, the USAO's interests. Next, the court determined that Roberts served the SEC's interests by reporting concerns about Mullane's alleged misconduct, which prompted the SEC to withdraw its offer of employment. Further, the court held that none of Mullane's allegations suggested that Greenberg defamed him or acted outside of the scope of his employment. We agree that the conduct discussed by the district court fell within the scope of Defendants' employment.

However, there are other actions—alleged by Mullane to be defamatory or otherwise unlawful—that the district court did not appear to consider. In particular, Mullane asserts that after his hearing before Judge Moreno, AUSA Lehr forwarded, from her personal email address, a copy of the hearing transcript and other documents to at least two media outlets. He further contends that the documents contained defamatory representations, and as such, Lehr's transmission of them constituted libel *per se*.

While we do not decide whether Mullane's allegations are sufficient to state a claim for libel, we conclude that the alleged act of sending the press documents pertaining to Mullane's personal civil suit—as pled in the complaint—is outside the scope of Lehr's employment. Sharing with media outlets a hearing transcript involving a USAO intern's civil case —unrelated to a case the USAO is investigating or prosecuting—is not an act "of the kind" an AUSA is "employed to perform[.]" *Iglesia Cristiana*, 783 So. 2d at 357. That conduct is neither "of the same general nature as" acts that federal prosecutors are usually authorized to take, nor is it

"incidental to . . . conduct authorized." *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So. 2d 748, 750 (Fla. Dist. Ct. App. 1985); RESTATEMENT (SECOND) OF AGENCY § 229 (1958). Moreover, Mullane's allegation that Lehr forwarded the documents from a personal email address plausibly suggests, at this preliminary stage, that her purported conduct occurred outside "the time and space limits authorized" by her employer. *Iglesia Cristiana*, 783 So. 2d at 357.

It is also not apparent how emailing the press a transcript, centered on an intern's alleged misconduct in a civil *pro se* matter, would serve the interests of the USAO. *See id.*; *Hennagan*, 467 So. 2d at 751 ("The purpose of the employee's act, rather than the method of performance thereof, is said to be the important consideration."). To the contrary, such an action, if it occurred, appears more consistent with a "purely personal" motive, either to publicly highlight Mullane's alleged misconduct, or perhaps simply to share news of an unusual courtroom exchange. *Bennett*, 102 F.3d at 489 ("[W]hen an employee undertakes an act purely personal in nature, no respondeat superior liability may be imposed."); *see Trabulsy v. Publix Super Mkt., Inc.*, 138 So. 3d 553, 555 (Fla. Dist. Ct. App. 2014) (explaining that an employee acts outside the scope of employment when he "steps aside" from his role to "accomplish some purpose of his own"). Of course, had Lehr merely sent the transcript to her colleagues to alert them of the incident involving Mullane and Judge Moreno, her actions would have aligned with her responsibility to supervise Mullane. But based on Mullane's allegations, which we must accept at this stage, Lehr did not act to further the

USAO's interests when she sent the hearing transcript and related documents to the media.

Our decision in *Nadler v. Mann*, 951 F.2d 301 (11th Cir. 1992), supports the conclusion that, based on the allegations of the complaint, Lehr's alleged transmission of the hearing transcript falls outside the scope of her federal employment. The *Nadler* court confronted the Westfall Act following an electoral contest between a state judge seeking re-election and an AUSA—coincidentally also at the Southern District of Florida's USAO—challenging the incumbent judge's seat. Shortly before the primary election, the AUSA, Frederick Mann, received a call from a public official claiming that the judge, Joseph Nadler, had accepted a bribe in a case pending before him. *Nadler*, 951 F.2d at 303. Mann relayed the allegations to a fellow AUSA and the Department of Justice's Public Integrity Section. *Id.* He also arranged a meeting between the FBI and the accuser. *Id.* The court agreed with Mann that because an AUSA has a duty "to make an alleged violation of federal law known to" investigating agencies, the steps he took to initiate a criminal investigation fell within the scope of his employment as an AUSA. *Id.* at 305-06.

But Mann was alleged to have gone a step further. According to Nadler, Mann defamed him by leaking the story of the FBI's investigation of the public official's bribery accusation to the *Miami Herald*. *Id.* at 306. In *Nadler*, we held that an AUSA who "leaks information regarding a criminal investigation to the news media . . . simply is not 'doing what his employment contemplated.'" *Id.*

As such, Mann could not receive the Westfall Act's protection with respect to that specific conduct.

So too here. While some of Lehr's alleged actions fall within the scope of her employment, sending Mullane's hearing transcript to members of the press does not. In fact, Lehr's purported conduct is even further afield from an AUSA's role than Mann's actions in *Nadler*. Lehr is alleged to have shared documents regarding an intern's *personal civil matter*. Unlike Mann, her alleged conduct did not involve a *criminal case* that the U.S. Attorney's Office might potentially investigate or prosecute.

Accordingly, we affirm the district court's decision as to the Westfall Act certification except as to its determination that all of Lehr's alleged acts were within the scope of her federal employment. If true, the sending of the hearing transcript and related documents to the media would fall outside the scope of Lehr's employment. Lehr would thus not be entitled to protection under the Westfall Act with respect to that alleged act.

## V.

We next address Mullane's argument that the district court erred in granting Judge Moreno judicial immunity with respect to the letter he sent to the University of Miami. Mullane contends Judge Moreno is not entitled to immunity for sending the letter because he had recused himself from the civil case and thus was operating outside of the court's jurisdiction. But the Supreme Court has long held that "judges . . . are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction,

and are alleged to have been done maliciously or corruptly." *Bradley v. Fisher*, 80 U.S. 335, 351 (1871).[4]

The only question left to us then is whether Judge Moreno's actions here were judicial acts. We agree with the district court that all of Judge Moreno's actions relating to scheduling and conducting the April 10th hearing as well as his subsequent recusal order are plainly judicial acts entitled to immunity. However, whether the letter to Mullane's law school constitutes a judicial act is a question warranting closer inspection.

"The relevant cases demonstrate that the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). Judge Moreno was acting within the expectations of the parties when he sent the letter because he had announced in his order granting Mullane's motion for his recusal that "the Court reserves the right upon further investigation to refer the matter to the Florida Bar, the University of Miami School of

---

[4] We find unconvincing Mullane's argument that the April 10, 2018, hearing in the civil case constituted a criminal contempt hearing triggering the applicability of Federal Rule of Criminal Procedure 42 and removing Judge Moreno's jurisdiction entirely. Judge Moreno's suggestion that he "may have a rule to show cause why [Mullane] shouldn't be held in contempt" did not convert the hearing into a separate criminal contempt proceeding. At no point, moreover, was Judge Moreno acting in "clear absence of all jurisdiction over the subject-matter." *Bradley*, 80 U.S. at 351.

Law, and the United States Attorney for any action they deem appropriate."

The district court rightly looked to the Code of Conduct for United States Judges in finding the letter to be a judicial act. "The Code of Conduct is the law with respect to the ethical obligations of federal judges[.]" *United States v. Microsoft Corp.*, 253 F.3d 34, 113 (D.C. Cir. 2001). Canon 3(B)(5) of the Code of Conduct, as applicable during the relevant time, instructed judges to "take appropriate action upon learning of reliable evidence indicating the likelihood that. . . a lawyer violated applicable rules of professional conduct." Judicial Conference of the United States, Code of Conduct for United States Judges (effective prior to March 12, 2019), *available* at [https://www.uscourts.gov/sites/default/files/2024-12/guide-vol02a-ch02-2014-03-19.pdf](https://www.uscourts.gov/sites/default/files/2024-12/guide-vol02a-ch02-2014-03-19.pdf). Canon 1 further demanded that "a judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved." *Id.* As the Code of Conduct makes clear, taking proper action in response to attorney misconduct is an important function federal judges perform to maintain the integrity of the judiciary and the legal profession.

Indeed, it has long been the law that disbarring an attorney as a sanction is a judicial act entitled to immunity as a necessary tool for the preservation of the integrity of the legal profession. *See Bradley*, 80 U.S. at 354 ("It is a power which should only be exercised for the most weighty reasons, such as would render the

continuance of the attorney in practice incompatible with a proper respect of the court for itself, or a proper regard for the integrity of the profession."). But this case is unique in that Judge Moreno found himself dealing with a not-quite-yet attorney practicing law in a *pro se* capacity who could neither be disbarred nor be disciplined, but who had the clear intention of imminently practicing law in Florida. Under the circumstances, Judge Moreno's observation of Mullane's behavior during the civil case could reasonably trigger his obligations under the Code of Conduct to take proper action to preserve the integrity of the judiciary and legal profession by reporting Mullane's behavior. *See, e.g., Barett v. Harrington*, 130 F.3d 246, 257-58 (6th Cir. 1997) (holding judge's letters to prosecutors regarding a litigant's potentially criminal behavior to be judicial acts and noting that "the functional approach . . . necessitates abstracting the nature of the act from the particular act at issue, *i.e.*, looking at 'the particular act's *relationship* to a function normally performed by a judge'") (cleaned up and emphasis in original).

From Judge Moreno's perspective, Mullane, a soon-to-be lawyer, had engaged in improper *ex parte* communications with Judge Moreno's clerk about his personal legal matter and gained entry into Judge Moreno's chambers through ambiguously declaring his association with the U.S. Attorney's Office, a potentially serious transgression for an attorney. Mullane, moreover, never contacted opposing counsel to inform them of the improper communications after the fact.

Further, in his letter to Mullane's law school, Judge Moreno stated that Mullane made a "blatant misstatement in a 'verified pleading'" because he represented in his motion for Judge Moreno's recusal that he had been dressed in beach attire when he gained access to Judge Moreno's chambers, but Judge Moreno purported to have viewed contradictory security footage showing Mullane in proper business attire. Mullane protests that the district court improperly credited Judge Moreno's assertions in this regard. But whether Mullane actually made a misrepresentation in a court filing is beside the point as far as the judicial immunity analysis is concerned. What matters is whether Judge Moreno's act was judicial in nature. *See Stump*, 435 U.S. at 362. Here, Judge Moreno's observations of Mullane stemmed from a judicial proceeding over which he presided, and Judge Moreno acted to report what he deemed an intentional misrepresentation by a litigant who was seeking to become a lawyer. An intentional misrepresentation of this kind is "incompatible with a proper respect of the court for itself, or a proper regard for the integrity of the profession." *Bradley*, 80 U.S. at 354. "A judge who should pass over in silence an offence of such gravity would soon find himself a subject of pity rather than of respect." *Id.* Accordingly, Judge Moreno's letter to the law school reporting Mullane's alleged misrepresentation to the court was a judicial act entitled to judicial immunity.

## VI.

We remand this case to the district court for further proceedings consistent with this opinion. Although we find that the

district court erred in part in its analysis of whether Lehr acted within the scope of her employment, we do not reverse its order substituting the United States as the defendant for claims asserted against Lehr. The Supreme Court has held that even where a Westfall Act certification is challenged, the United States "must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn*, 549 U.S. at 231.

As such, prior to any potential re-substitution of Lehr, the district court must decide, in the first instance, whether the relevant acts alleged by Mullane did *in fact* occur.[5]

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

---

[5] The district court may have occasion to consider whether and to what extent discovery should be allowed related to the Westfall Act certification of Lehr. This court has not yet established a standard for deciding whether a plaintiff is entitled to discovery to challenge such a certification. *See Omnipol*, 32 F.4th at 1310 (Jordan, J., concurring). If discovery is permitted, it should be limited in scope. *See U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 251 (4th Cir. 2018) (noting that a district court may "permit limited discovery or conduct an evidentiary hearing to resolve competing factual claims concerning the scope-of-employment issue" (quotation omitted)); *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009) (explaining that if a plaintiff pleads sufficient facts to plausibly allege that a defendant acted outside the scope of employment, the plaintiff "may, if necessary, attain 'limited discovery' to resolve any factual disputes" (quoting *Stokes v. Cross*, 327 F.3d 1210, 1214, 1216 (D.C. Cir. 2003))); *Schrob v. Catterson*, 967 F.2d 929, 936 (3d Cir. 1992) (stating that any discovery permitted should be "circumscribed as narrowly as possible" when a scope-of-employment certificate is challenged).