# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-1048
_____

FIRST UNITED METHODIST
CHURCH OF HOBE SOUND,
FLORIDA, INC., et al.,

    Appellants,

    v.

THE BOARD OF TRUSTEES OF THE
FLORIDA ANNUAL CONFERENCE
OF THE UNITED METHODIST
CHURCH, INC., et al.,

    Appellees.

_____

On appeal from the Circuit Court for Bradford County.
George M. Wright, Judge.


April 8, 2026

NORDBY, J.

This case presents the weighty issue of whether a state court may wade into an intra-church property dispute. Appellants, a group of churches, seek to disaffiliate from the United Methodist Church (UMC) and its clergy. Each of these churches wants to keep its real property when doing so.

The parties litigated the matter internally through UMC's highest adjudicatory body. That ecclesiastical court concluded that

any disaffiliation had to proceed under a specific provision of UMC's governing document. This ruling meant that Appellants would have to pay a sum of money to UMC in order to retain their property upon disaffiliation.

Appellants then filed this lawsuit to invalidate part of UMC's governing document. As the trial court described the situation, members of these churches "are faced with either remaining a part of a religious organization they believe has abandoned its central ten[e]ts, or giving up the land where their relatives are buried, the sanctuary where their children were baptized, and the place in their community where the most important moments in their lives are marked." From UMC's perspective, Appellants are asking a state court to intrude on a matter already resolved by UMC's highest ecclesiastical court.

The trial court concluded that, because Florida has adopted a deference approach to property disputes within hierarchical churches, it could not consider Appellants' property dispute claims. Accordingly, it dismissed the case. For the reasons that follow, we must affirm. That said, we also certify a question of great public importance to the Florida Supreme Court.

I.

In 1968, UMC was founded and established as a hierarchical denomination of Christianity. Structurally, it is a four-tier religious organization. Sitting at the top lies "The General Conference," followed by regionally divided "Jurisdictional Conferences." Third are the "Annual Conferences," and finally, the "Local Churches."

UMC's governing document is "The Book of Discipline of the United Methodist Church." Upon affiliation with the UMC, local churches and members must submit to the Discipline. Submission requires assenting to both theological and practical statements. In 2019, UMC "affirmed its commitment to the greater orthodox doctrine of the universal church," but Appellants argue that affirmation was in vain. Appellants claim that departures from the Discipline by clergy and other churches caused them to seek disaffiliation. Coinciding with the theological shift, UMC amended

the Discipline to change the conditions under which local churches may disaffiliate from the UMC. Previously, potential disaffiliates were governed solely by the "Trust Clause" of the Discipline:

> 1. All properties of United Methodist local churches and other United Methodist agencies and institutions are held, in trust, for the benefit of the entire denomination, and ownership and usage of church property is subject to the *Discipline.*

***

> The United Methodist Church is organized as a connectional structure, and titles to all real and personal, tangible and intangible property held . . . by a local church or charge, or by an agency or institution of the Church, shall be held in trust for The United Methodist Church and subject to the provisions of its *Discipline.*

***

> 2. The trust is and always has been irrevocable, except as provided in the *Discipline.* Property can be released from the trust, transferred free of trust or subordinated to the interests of creditors and other third parties only to the extent authority is given by the *Discipline.*

> 3. Local churches . . . may acquire, hold, maintain, improve, and sell property for purposes consistent with the mission of the Church, unless restricted or prevented by the *Discipline.*

The Discipline ¶ 2501 (italics in original). The Discipline also provided specific language that all local churches were required to incorporate into the deeds of their real property. Absence of the provided language, however, did not relieve a local church of its responsibilities towards the mother-church, nor did it absolve the local church from "the responsibility to hold all of its property in trust for" the UMC. The Discipline ¶ 2503.6. Instead, before 2019, for a local church to be relieved of its duties under the Discipline, the governing document provided:

With the consent of the presiding bishop and of a majority of the district superintendents and of the district board of church location and building and at the request . . . of a meeting of the membership of the local church, . . . the annual conference may instruct and direct the board of trustees of a local church to deed church property to . . . another evangelical denomination under a[] . . . comity agreement, provided that such agreement shall have been committed to writing and signed and approved by the duly qualified and authorized representatives of both parties concerned.

The Discipline ¶ 2548.2.

But in 2019, the following paragraph was added to the Discipline, modifying how potential disaffiliates were to proceed:

Because of the current deep conflict within The United Methodist Church . . . a local church shall have a limited right, under the provisions of this paragraph, to disaffiliate from the denomination for reasons of conscience regarding a change in the requirements and provisions of the *Book of Discipline* . . . as resolved and adopted by the 2019 General Conference, or the actions or inactions of its annual conference related to these issues . . . .

The Discipline ¶ 2553.1. Appellants contend that the 2019 addition to the Discipline created onerous and cost prohibitive restraints on disaffiliation. Under this new paragraph, as part of the disaffiliation process, Appellants must pay a sum of money to keep their property. Appellants cannot negotiate nor internally appeal the price for disaffiliation, which is set unilaterally by the Annual Conference.

So, as Appellants describe the situation in their amended complaint, rather than allowing the local churches to amicably disaffiliate under paragraph 2548.2, the Annual Conference is holding Appellants' property "for ransom" by requiring them to proceed under the newly minted paragraph 2553. The record reflects that, in 2022, the question over which paragraph provided

4

the proper pathway for disaffiliation by local churches was decided by UMC's highest internal judicial body. In Decision No. 1449, the Judicial Council concluded that paragraph 2548.2 could not be used for disaffiliation; instead, paragraph 2553 provided the sole route for local churches to exit UMC.

Below, Appellants' amended complaint asserted several counts. Some counts challenged the Trust Clause of the Discipline as invalid for violating chapters 689 (Conveyances of Land and Declarations of Trust) and 736 (Florida's Trust Code) of the Florida Statutes. Other counts asserted UMC and its Bishop breached a fiduciary duty to the church trust and sought an accounting. UMC responded that the lower court could not adjudicate the claims because of the hierarchical deference approach—an ecclesiastical abstention doctrine under which secular courts defer to a church's hierarchical authority on matters of internal church governance and intra-church property disputes. Appellants asserted that their claims were not ecclesiastical in nature, and thus the neutral application of Florida trust law should resolve the dispute. The trial court agreed with UMC that the hierarchical deference doctrine barred its consideration of Appellants' claims. In the alternative, the trial court also concluded that the "local action rule" set out in section 47.011, Florida Statutes, barred Appellants' attempt to invalidate the Discipline's Trust Clause. The trial court accordingly dismissed Appellants' amended complaint. This appeal follows.

II.

The First Amendment to the United States Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Amend. I, U.S. Const. The Florida Constitution makes similar guarantees. Art. I, § 3, Fla. Const. Courts thread a fine needle when religious institutions make competing property law claims. As the United States Supreme Court has explained, "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*, 426 U.S. 696, 709–10 (1976) (quoting *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969)).

5

Thus, the Supreme Court has recognized two main approaches for resolving intra-church property disputes, either of which a State may choose to adopt.

A.

The first method, sometimes called the ecclesiastical abstention doctrine, or the hierarchical deference approach, is (as its name suggests) deferential: "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories . . . the legal tribunals must accept such decisions as final, and as binding on them . . . ." *Watson v. Jones*, 80 U.S. 679, 727 (1872); *see also Milivojevich*, 426 U.S. at 709 ("[T]he First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity . . . ."). This is because "those who voluntarily unite themselves to a religious association do so with an implied consent to the association's manner of governance and are bound to submit to it." *New Jerusalem Church of God, Inc. v. Sneads Cmty. Church, Inc.*, 147 So. 3d 25, 28 (Fla. 1st DCA 2013) (citing *Watson*, 80 U.S. at 728–29).

In first recognizing this deferential method in 1872, the Supreme Court made clear it was rejecting the English common law approach to such property disputes. *Watson*, 80 U.S. at 727. Under the English "true standard of faith" rule, a court was to "inquire and decide for itself, not only what was the nature and power of [a church's ecclesiastical governance], but what is the true standard of faith in the church organization, and which of the contending parties before the court holds to this standard." *Id.* Thus, courts were to fully engage in the dispute and award property to the faction demonstrating adherence to the established tenets of the church. Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 311-12 (2016).

Explaining that its departure from the English approach was "founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority," the Supreme Court was candid.

6

*Watson*, 80 U.S. at 727. It did "not think the doctrines of the English Chancery Court on this subject should have with us the influence which we would cheerfully accord to it on others." *Id.* at 729.

As for non-hierarchical churches—existing as a "strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government"—the deference approach would not apply (as there was no hierarchical authority to afford deference). *Id.* at 724. Instead, in the event of a schism or property dispute, "the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations." *Id.* at 725.

Notably, the Supreme Court did not resolve a constitutional claim in *Watson*. Rather, it made a pre-*Erie*[1] federal common law ruling over who owned the church property. But in a series of twentieth century cases, the Court would later declare the English rule constitutionally impermissible and ground *Watson*'s hierarchical deference approach under the umbrella of the First Amendment. *See, e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 120–21 (1952) ("Ours is a government which by the 'law of its being' allows no statute, state or national, that prohibits the free exercise of religion. There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion.") (footnotes omitted); *see generally* McConnell & Goodrich, *supra*, at 315–16.

---

[1] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

B.

The second approach calls for applying "neutral principles of law" to resolve church property matters. Under this method, a court's application of neutral principles of law "relies exclusively on objective, well-established concepts of trust and property law . . . . [and] ensure[s] that a dispute over the ownership of church property will be resolved in accord with the desires of the members" as any other private right dispute. *Jones v. Wolf*, 443 U.S. 595, 603–04 (1979).

In approving the approach, the Court in *Jones v. Wolf* highlighted the benefits of applying neutral principles to church property disputes. The approach was "completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity." *Id.* at 603. Of course, the method would likely not be "wholly free of difficulty." *Id.* at 604. But the method's positives—"the promise of nonentanglement and neutrality"—can outweigh the negatives. *Id.*

With its recognition of the neutral principles approach as a constitutionally permissible alternate method, however, the Supreme Court made clear that each state could choose which method to employ: "the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes." *Id.* at 602. "Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Id.* (quoting *Maryland & Va. Churches v. Sharpsburg Church*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring)).

C.

Given that the U.S. Constitution permits states to employ either approach to resolve intra-church property disputes, states have exercised that choice. A majority of states employ some version of the neutral principles approach. *See* McConnell & Goodrich, *supra*, at 319 (citing a 2008 survey of states that reflected "29 states [having] adopted some version of the 'neutral

8

principles' approach, while 9 retained the *Watson* approach, and 12 are unclear or undecided"). But Florida stands in the minority.

Florida courts abide by the hierarchical deference approach. This is because the Florida Supreme Court (both pre- and post-*Jones v. Wolf*) recognized and approved *Watson*'s hierarchical deference approach to resolving intra-church property disputes. *See Mills v. Baldwin*, 362 So. 2d 2, 4–5 (Fla. 1979) (*Mills I*) (quashing a district court decision that had applied "neutral principles of law" and adhering to the hierarchical deference approach), *vacated and remanded*, 443 U.S. 914 (1979), *reinstated*, *Mills v. Baldwin*, 377 So. 2d 971 (Fla. 1979) (*Mills II*) (reinstating *Mills I* as "not inconsistent" with *Jones v. Wolf*), *cert. denied*, 446 U.S. 983 (1980); *New Jerusalem Church of God*, 147 So. 3d at 29 ("The history of *Mills* makes it 'apparent that Florida has made the decision to apply the deference to church authority approach when resolving church property disputes.'") (quoting *Townsend v. Teagle*, 467 So. 2d 772, 775 (Fla. 1st DCA 1985)); *Bethel AME Church of Newberry, Florida v. Domingo*, 654 So. 2d 233, 234 (Fla. 1st DCA 1995) ("The principle of church structure which governs church property disputes, as articulated in [*Mills I*], requires that church property remain with the parent church where, as here, the church is hierarchical in structure."); *see also St. John's Presbytery v. Cent. Presbyterian Church of St. Petersburg*, 102 So. 2d 714, 718 (Fla. 1958) ("When the church is representative, republican or episcopal in government, the authorities uniformly hold that the church property whether held by an express or an implied trust cannot be diverted from the parent church by those who withdraw from it and form a separate denomination. It matters not whether those who withdraw from the mother church constitute a majority or a minority faction, the church property remains with the mother church.").

This Court has thus articulated a two-part test to determine whether the deference approach applies. First, we decide whether a religious institution is hierarchical. *New Jerusalem Church of God*, 147 So. 3d at 28–30. Then, if so, we decide whether the local church is affiliated with that hierarchy. *Id.* When local churches are part of a denomination's hierarchy, and thereby subordinate to it, the hierarchy must be able to dictate the terms of disaffiliation and the consequences thereof. *Id.* at 29–30 (citing *Full Gospel*

9

*Temple of Tallahassee v. Redd*, 82 So. 2d 589, 590 (Fla. 1955) ("When appellants withdrew from the parent church . . . , they carried nothing but their membership with them; the parent church retained title to the properties.")).

To be clear, not all activity by religious institutions or clergy is shielded from state court involvement. In a third-party tort claim against a church, the Florida Supreme Court recognized the distinction between disputes that are "intra-church" and those that arise between churches and third parties. *Malicki v. Doe*, 814 So. 2d 347, 356 (Fla. 2002) ("Intrachurch disputes, however, must be distinguished from disputes between churches and third parties."). In the latter category,

> A court thus must determine whether the dispute is an ecclesiastical one about discipline, faith, *internal organization*, or ecclesiastical rule, custom or law, or whether it is a case in which [it] should hold religious organizations liable in civil courts for purely secular disputes between *third parties* and a particular [religiously affiliated] defendant.

*Id.* at at 357 (first alteration in original) (emphasis added) (quotations and citations omitted). Accordingly, in third-party disputes, "[a] church or religious organization seeking to avoid application of a neutral state law must first show why application of the law requires adjudication of an ecclesiastical matter." *Malichi v. Archdiocese of Miami*, 945 So. 2d 526, 529 (Fla. 1st DCA 2006) (citing *Malicki*, 814 So. 2d at 354).

### III.

Appellants contend that their case is not precluded by the hierarchical deference doctrine. Because they raise state-law claims against the Discipline's Trust Clause, in Appellants' view, it is appropriate for a state court to wade into the dispute and resolve the matter on neutral state-law principles. But that view ignores the backdrop of the hotly contested internal church dispute that led to the filing of the complaint. It also disregards the significant implications of a state court considering claims that

10

seek to undo the internal adjudication of the property dispute by the church's highest judicial council.

On its face, Appellants' amended complaint reveals that this suit arises from a church governance dispute. Because the hierarchy changed the Discipline in 2019 to allow the Annual Conference to determine which section of the Discipline to apply to a local church's disaffiliation request, Appellants assert that UMC is "hold[ing] for ransom" the local churches' real and personal property. We acknowledge that Appellants are dissatisfied that UMC chose one paragraph in the Discipline to resolve their internal dispute, rather than another. But this Court is jurisdictionally incapable of forcing UMC to apply one provision of its governing document over another. *Milivojevich*, 426 U.S. at 713 ("For civil courts to analyze whether the ecclesiastical actions of a church judicatory are . . . 'arbitrary' must inherently entail inquiry into the . . . substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits . . . ."). As a way around that conclusion, though, Appellants make the following two arguments.

A.

First, Appellants argue that whether the Trust Clause in the Discipline creates a valid trust is a legal question that can be resolved via the application of neutral principles of law. At the outset, they must prove that this Court may do so. Appellants offer *Flynn v. Estevez*, 221 So. 3d 1241 (Fla. 1st DCA 2017), to suggest that this Court's default position is to apply neutral principles of law, unless the religious institution proves that the dispute is ecclesiastical. True, *Flynn* recognized that the Florida Supreme Court and our sister districts have applied neutral principles of law for "secular tort claims by third parties against a religious institution, allegations of fraudulent misrepresentation, [and] claims of breach of contract." *Flynn*, 221 So. 3d at 1247 (collecting cases) (footnotes omitted). But none of those cases are relevantly similar to the claims here. Indeed, in *Flynn*, we noted the "core application" of *Watson*'s hierarchical deference doctrine to "cases where a court intrudes on a church's autonomous management of its own internal affairs and property" and thus "burdening or inhibiting the exercise of religious freedom." *Id.* at 1246.

11

In *Flynn*, a Catholic diocese set a policy that required all students in its private schools to be vaccinated. *Id.* at 1243. A Catholic parishioner attempted to apply a state statute that created a religious exemption for vaccination requirements in public and private schools against the Diocese. *Id.* Given that the Roman Catholic Church is hierarchical and "governance of its parochial schools is inherently religious," this Court rejected the neutral principles of law approach to resolve the dispute and deferred to the Church on the intra-faith "kerfuffle" underlying the dispute. *Flynn*, 221 So. 3d at 1249, 1251. ("We can't help but note the incongruity of giving primacy to a parishioner's religious viewpoint that is contrary to that of his mother-church on the same topic . . . it would be an odd role reversal—a devotee's tail wagging the corpus of church leadership—to do so.").

The cases in which Florida courts applied the neutral principles of law approach are even less helpful to Appellants than *Flynn*. Each of those cases involves either third parties suing a religious institution or, in one instance, a non-hierarchical church being subject to statutory, non-profit board removal processes because the church did not have bylaws. *See Malicki*, 814 So. 2d at 347 (allowing neutral principles of tort law to resolve claim for negligent hiring against Catholic Church where priest was alleged to sexually batter minors); *Bilbrey v. Myers*, 91 So. 3d 887 (Fla. 5th DCA 2012) (applying neutral principles of defamation law to third party suit against former pastor and church); *Bendross v. Readon*, 89 So. 3d 258 (Fla. 3d DCA 2012) (neutral principles of business law applied to congregational church that arbitrarily removed board members and lacked bylaws); *Favalora v. Sidaway*, 995 So. 2d 1133 (Fla. 4th DCA 2008) (neutral principles of agency law applied in third party suit against Catholic Church). In none of these examples do we have an intra-faith dispute within a hierarchical church over who gets to keep the property of the local church when the local church seeks to leave the mother-church.

Further, Appellants' attempt at distinguishing *New Jerusalem* is unpersuasive. Appellants' amended complaint cedes the two dispositive questions in *New Jerusalem*: (1) UMC is a hierarchical denomination, and (2) Appellants are arms of that hierarchy as local churches. Under *New Jerusalem*, the case

12

resolves itself. Dissatisfied with the current state of law, Appellants ask us to innovate and apply the neutral principles of law approach in a novel way. But opting to do so here would require us to ignore binding precedent from our supreme court in both *Mills* cases (which had quashed this Court's decision applying "neutral principles of law"), as well as our Court's decision in *New Jerusalem*, thus rendering the hierarchical deference approach a legal nullity. Indeed, it would undermine the very reason that the doctrine was developed in the first place: to respect that "those who voluntarily unite themselves to a religious association do so with an implied consent to the association's manner of governance and are bound to submit to it." *New Jerusalem*, 147 So. 3d at 28 (citing *Watson*, 80 U.S. at 728–29).

B.

In the alternative, Appellants make an as-applied constitutional challenge to the hierarchical deference doctrine. Appellants allege that the doctrine violates the First Amendment's Establishment Clause because it favors hierarchically structured churches over congregational denominations.[2]

To begin, this doctrine was first articulated over one hundred and fifty years ago by the United States Supreme Court. *Watson*, 80 U.S. at 727. It has been approved ever since. *See*, *e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020); *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 185–86 (2012); *Jones*, 443 U.S. at 602; *Kedroff*, 344 U.S. at 115–16. Likewise, Florida courts maintain the constitutionality of the doctrine. *See Malicki*, 814 So. 2d at 347; *Flynn*, 221 So. 3d at 1247 (collecting cases). Appellants fail to overcome the weight of this authority.

---

[2] We note that, in their Initial Brief, Appellants raise other constitutional challenges to the hierarchical deference approach. Because Appellants failed to raise their equal protection and due process challenges below, we decline to consider these unpreserved arguments for the first time on appeal.

Boiled down, Appellants' challenge (although framed as an as-applied challenge) amounts to arguing that the deference approach grants hierarchical churches, generally, and UMC specifically, special favor in the law. Establishment Clause challenges are guided by "reference to historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 566 (2014); *Am. Legion v. Am. Hum. Ass'n*, 588 U.S. 29, 61 (2019) (same). Rather than challenge the deference approach as historically wrong, Appellants argue that the "blind deference" owed to hierarchical and not congregational religious structures is an impermissible privilege to hierarchical churches. We are not persuaded. Nor was the Supreme Court over 70 years ago. *See Kedroff*, 344 U.S. at 119-21.

At its core, the doctrine ensures that civil authorities do not impinge on a religious hierarchy's Free Exercise[3] right to organize and associate the way it chooses. That some religions, based on their different beliefs, choose to organize congregationally does not mean that the State must intrude on the right of hierarchical institutions to have internal tribunals that resolve intra-church disputes. *See Watson*, 80 U.S. at 729 ("But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed."); *Kedroff*, 344 U.S. at 120–21 ("Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion.") (footnote omitted). In short, we are not

_____

[3] *See Malicki*, 814 So. 2d at 355 n.6 (Fla. 2002) (citations omitted) ("Although the United States Supreme Court has often discussed this principle in the context of the Free Exercise Clause, . . . the United States Supreme Court has also referred to this principle in the context of the Establishment Clause. . . . It is apparent that the religious autonomy principle articulated by [the Court] may implicate both the Free Exercise Clause and the Establishment Clause.").

persuaded by Appellants' argument that the deference approach is impermissibly favorable to hierarchical churches.

IV.

Because the hierarchical deference approach remains the applicable standard governing Florida courts' consideration of property disputes arising from within hierarchical churches, we affirm the trial court's dismissal of Appellants' claims. In light of our affirmance, we need not reach the trial court's alternative ruling based on the "local action rule."

That said, given the significance of the First Amendment questions presented here, we certify the following question of great public importance to the Florida Supreme Court:

1) WHEN ASKED TO ADJUDICATE STATE-LAW CLAIMS TO RESOLVE INTRA-CHURCH PROPERTY DISPUTES INVOLVING HIERARCHICAL CHURCHES, ARE FLORIDA COURTS STILL GOVERNED BY THE HIERARCHICAL DEFERENCE APPROACH OR MAY SUCH DISPUTES BE RESOLVED UNDER THE NEUTRAL PRINCIPLES OF LAW APPROACH ?

AFFIRMED.

LEWIS and M.K. THOMAS, JJ. concur.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

David C. Gibbs III of the National Center for Life and Liberty, Largo; Jeremy D. Bailie of Weber, Crabb & Wein, P.A., St. Petersburg, for Appellants.

Frank E. Brown, Gregory A. Hearing, Sacha Dyson, Kevin M. Sullivan of Bush Graziano Rice & Platter, P.A., Tampa, for Appellees.